

RECEIVED CVK
10/8/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

**Tamara Wallace, Plaintiff,**

**v.**

**1:25-cv-12325**
**Judge Mary M. Rowland**
**Magistrate Judge Heather K. McShain**
**RANDOM/Cat. 2**

**T-Mobile USA, Inc., Credence Resource Management, LLC, Southwest Credit Systems, LP, Experian Information Solutions, Inc., Equifax Inc., and TransUnion LLC.**

**JOINDER OF DEFENDANTS**

Plaintiff respectfully asserts that joinder of the above-named Defendants is proper pursuant to 735 ILCS 5/2-404, as the claims arise from a common nucleus of operative facts and involve overlapping legal questions. Each Defendant played a role in the continuing harm through interconnected actions, including inaccurate credit reporting, negligent data furnishing, failure to respond to disputes, and systemic breakdown in accountability.

This Complaint centers on a single disputed tradeline and its prolonged impact on Plaintiff's credit access, financial standing, and emotional wellbeing. Consolidating all claims in one action promotes judicial economy, avoids inconsistent rulings, and ensures full accountability for the cumulative and coordinate misconduct of all Defendants.

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal statutes including the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.) and the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.).

2. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this District under 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants conduct business within the Northern District of Illinois.

## II. PARTIES

4. Plaintiff Tamara Wallace is a resident of Will County, Illinois. Plaintiff Tamara Wallace is a resident of Will County, Illinois, and the injuries described herein were sustained within this District.

5. Defendant T-Mobile USA, Inc. is a Delaware corporation with its principal place of business in Bellevue, Washington. T-Mobile regularly conducts business in the State of Illinois and is engaged in the provision of wireless telecommunications services.

6. Defendant Credence Resource Management LLC is a Texas limited liability company with its principal place of business in Dallas, Texas. Credence regularly conducts debt collection activities in the State of Illinois. At all relevant times, Credence acted as a debt collection agent for T-Mobile, authorized to collect and report on T-Mobile's behalf.

7. Defendant Southwest Credit Systems, LP is a Texas limited partnership with its principal place of business in Carrollton, Texas. Southwest regularly conducts debt collection activities in the State of Illinois. At all relevant times, Southwest acted as a debt collection agent for T-Mobile, authorized to collect and report on T-Mobile's behalf.

8. Defendant Experian Information Solutions, Inc. is an Ohio corporation with its principal place of business in Costa Mesa, California. Experian is a consumer reporting agency as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f), and regularly conducts business in the State of Illinois.

9. Defendant Equifax Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia. Equifax is a consumer reporting agency as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f), and regularly conducts business in the State of Illinois.

10. Defendant TransUnion LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. TransUnion is a consumer reporting agency as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f), and regularly conducts business in the State of Illinois.

11. Credence Resource Management and Southwest Credit Systems remain directly liable for their own violations. As principal, T-Mobile is vicariously liable for those same violations under the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and the Illinois Consumer Fraud Act. Both entities acted within the scope of their authority as T-Mobile's debt collection agents, authorized to collect and report on T-Mobile's behalf. T-Mobile retained control over the underlying account and benefited from the collection and furnishing activities carried out by its agents. Accordingly, T-Mobile is responsible for the statutory violations committed by Credence and Southwest in connection with credit reporting, dispute handling, and collection activity.

### III. FACTUAL ALLEGATIONS

12. In or around September 2023, Plaintiff Tamara Wallace enrolled in internet service with T-Mobile, which included the shipment of a modem device necessary to activate service. *(See Exhibit A1.1)*

13. On or about September 21, 2023, Plaintiff received a "Welcome to T-Mobile" email confirming enrollment in the internet service. The communication stated that the account had been activated and that the equipment necessary to initiate service was en route. *(See Exhibit A1.2)*

14. On or about September 22, 2023, Plaintiff received an email from Defendant T-Mobile stating that her order had been delivered. Drawing upon her experience as a business owner, Plaintiff understood that delivery confirmations are not always reliable and that packages may be prematurely marked as delivered despite delayed arrival. Accordingly, Plaintiff waited a reasonable period before contacting T-Mobile, anticipating that the modem might still arrive. *(See Exhibit A2)*

15. On or about September 23, 2023, Defendant T-Mobile issued a billing statement reflecting charges on Plaintiff's account. Having never accessed T-Mobile's internet service, Plaintiff initially assumed the billing was part of standard protocol and did not immediately question it. However, no equipment had been received, no service had been accessed, and no activation had occurred. This discrepancy between the reported activation and the actual absence of service constitutes a misrepresentation of service commencement for billing purposes. As the facts will show, this was not an isolated error but part of a broader pattern of premature billing, procedural neglect, and systemic disregard for consumer protections. If this misrepresentation was later furnished to any credit reporting agency as an active or delinquent account, it constitutes a violation of **FCRA § 623(a)(1)** and, if pursued by a debt collector, **FDCPA § 807(2)(A)**—including but not limited to additional violations to be detailed in the Violation Index. *(See Exhibit A3)*

16. On or about October 3, 2023, Plaintiff contacted Defendant T-Mobile to report that the modem had not arrived. Despite Plaintiff's clear request for resolution, the representative merely advised her to wait for potential delivery or inquire with neighbors. No formal investigation was initiated, and no tracking update was provided. This failure to act upon a direct report of non-delivery reflects a disregard for basic consumer service protocols and further compounds the misrepresentation of service status. *(See Exhibit B1)*

17. On or about October 9, 2023, Plaintiff placed a second call to Defendant T-Mobile to formally cancel the account due to continued non-receipt of the modem, having already complied with T-Mobile's instruction to wait and inquire with neighbors. With no equipment received and alternative internet service available through her adult son's Xfinity account, Plaintiff elected to discontinue further attempts to initiate

service. Despite this clear cancellation request, Defendant failed to issue written confirmation or initiate account closure. This refusal, despite repeated notice and lack of service, reflects a deepening pattern of procedural neglect later confirmed in Plaintiff's sworn affidavit and contradiction matrix. This conduct constitutes a violation of FCRA § 623(a)(1) and, if furnished or collected upon, FDCPA § 807(2)(A), with additional violations detailed in the Violation Index. The violation spans from October 9, 2023, through the date the account was formally closed or corrected, constituting one violation per day. *(See Exhibit B2, HH)*

18. On or about October 12, 2023, Plaintiff received an email from Defendant T-Mobile confirming that an attempted payment had been processed on her account. This action occurred despite Plaintiff's prior cancellation request on October 9, 2023, and in the continued absence of any delivered equipment or activated service. Defendant T-Mobile had not issued confirmation of cancellation, nor had it acknowledged that service was never initiated. Due to the absence of any acknowledgement of cancellation, Plaintiff proactively blocked her payment card to prevent further charges. This conduct reflects continued billing for unrendered service in violation of 815 ILCS 505/2 and further evidences Defendant's disregard for procedural integrity and consumer protections. This conduct constitutes a violation of FCRA § 623(a)(1) and, if furnished or collected upon, FDCPA § 807(2)(A), including but not limited to additional violations to be detailed in the Violation Index. This violation spans from October 12, 2023, through the date the account was formally closed or corrected, constituting one violation per day. *(See Exhibit B3)*

19. On or about October 20, 2023, Plaintiff received a second email from Defendant T-Mobile confirming another attempted payment processing on her account. This occurred despite Plaintiff's unequivocal cancellation request on October 9, 2023, and in the continued absence of any delivered equipment or activated service. Defendant T-Mobile's repeated billing efforts, without acknowledgment of cancellation or service non-initiation, reflect a disregard for Plaintiff's prior communications and raise concerns regarding improper account handling. This conduct constitutes continued billing for unrendered service in violation of 815 ILCS 505/2 and further evidences a pattern of procedural neglect and consumer harm. This conduct constitutes a violation of FCRA § 623(a)(1) and, if furnished or collected upon, FDCPA § 807(2)(A), including but not limited to additional violations to be detailed in the Violation Index. This violation spans from October 20, 2023, through the date the account was formally closed or corrected, constituting one violation per day. *(See Exhibit B4)*

20. On or about October 21, 2023, Plaintiff received a third email from Defendant T-Mobile confirming yet another attempted payment processing—despite Plaintiff's unequivocal cancellation request on October 9, 2023, and the continued absence of delivered equipment or activated service. Defendant's repeated billing efforts, in direct contravention of Plaintiff's documented communications and without any substantiated basis for service initiation, constitute unauthorized billing and

improper account handling. This conduct violates 815 ILCS 505/2 by billing for unrendered services and further evidences a sustained disregard for consumer protections, as substantiated in Plaintiff's sworn affidavit and contradiction matrix. It also constitutes a violation of FCRA § 623(a)(1) and, if the inflated balance was furnished or pursued by any third-party collector, a violation of FDCPA § 807(2)(A) for misrepresenting the character and legal status of the alleged debt. These violations persisted from October 21, 2023, through the date the account was formally closed or corrected, with each day constituting a separate and actionable breach. *(See Exhibit B5, HH)*

21. On or about October 21, 2023, Defendant T-Mobile issued a confirmation email acknowledging Plaintiff's prior cancellation request and enclosed a return shipping label for the modem. Despite documented awareness that Plaintiff never received the equipment, Defendant proceeded to demand its return—an action that directly contradicts its own records and disregards Plaintiff's prior communications. This breakdown in internal account handling and procedural integrity is documented in Plaintiff's sworn affidavit and contradiction matrix and constitutes a deceptive practice under 815 ILCS 505/2. It further violates FCRA § 623(a)(1) by furnishing information known to be inaccurate, and, if pursued or furnished to any third party, FDCPA § 807(2)(A) for misrepresenting the character and legal status of the alleged debt. This violation spans from October 21, 2023, through the date the account was formally corrected, with each day constituting a separate breach. (See Exhibit B6.1-3, HH)

22. On or about November 2, 2023, Plaintiff received an email from Defendant T-Mobile in response to her inquiry confirming that no charges would apply to a modem that had not been delivered. In this written communication, Defendant T-Mobile acknowledged that the device (IMEI: 861857063985957) was never received, internally blocked the IMEI, initiated a shipping claim, and affirmed that Plaintiff would not be held financially responsible. This email constituted actual knowledge of the error and triggered Defendant's statutory duty to correct any prior or future furnishing of inaccurate account data under FCRA § 623(a)(1). It also reinforced the absence of any rendered service, further evidencing deceptive billing conduct in violation of 815 ILCS 505/2. This conduct constitutes a violation of **FCRA § 623(a)(1)**—including but not limited to additional violations to be detailed in the Violation Index. This violation spans from **November 2, 2023**, through the date any previously furnished inaccurate data was corrected, constituting **one violation per day**. *(See Exhibit C)*

23. Between October 9, 2023 and July 25, 2025,  Defendant T-Mobile continued to bill Plaintiff for a device it had previously confirmed was never received and for which it had assured Plaintiff she would not be charged. On or about December 5, 2023, Defendant applied a $220 nonreturn fee to Plaintiff's account, directly contradicting its prior written assurance of no financial responsibility. On January 29, 2024,

Defendant referred the account to collections, inflating the balance to $396.10. Plaintiff did not learn of this referral or the nature of the charges until October 2024, when reviewing her credit reports. Defendant did not disclose the specific reason for the inflated balance until July 23, 2025, when it issued written correspondence clarifying the timeline. *(See Exhibit C, HH)*

24. Plaintiff remained unaware of the account's existence and its referral to collections until nearly a year later.  Upon investigation, Plaintiff discovered that Southwest Credit Systems had received the account on January 29, 2024 (See Exhibit HH). Despite this assignment, Plaintiff was never notified—no validation notice, no correspondence, and no mail or email. USPS Informed Delivery confirms the absence of mailed communication. Whether Defendant T-Mobile failed to relay the dispute or Southwest Credit Systems ignored it remains unclear, as neither party has provided the records Plaintiff is entitled to under law. Plaintiff reserves the right to place this issue on the docket for judicial clarification. The burden of transparency lies with furnishers and collectors, not the consumer. *(See Exhibit E.1-3)*

25. On or about March 5, 2024, Southwest Credit Systems furnished a collection tradeline to Equifax (See Exhibit E), followed by Experian on or about March 25, 2024 (See Exhibit G Part 1), without prior notice or validation. This triggered a thirty-five-point drop in Plaintiff's credit score (See Exhibit G Part 2) and was only discovered months later during a retrospective review. No correspondence was issued before or after furnishing, and USPS Informed Delivery confirms no mail was received. The same account is believed to have surfaced on TransUnion, pending verification. This conduct constitutes violations of FCRA § 623(a)(3) and FDCPA § 809(a), and evidences reputational harm and procedural failure. *(See Exhibit E.1, G.1-2)*

26. On or about October 9, 2024, Plaintiff reviewed her credit history in preparation for a vehicle purchase, intending to assess her eligibility and purchasing power. At that time, Plaintiff was only aware of a single potential tradeline involving a separate creditor, which she reasonably believed had been resolved through prior correspondence received by mail. Upon reviewing her Experian and TransUnion credit reports, Plaintiff discovered a previously unknown collection tradeline from Credence Resource Management. This was the first indication that Defendant T-Mobile had placed the disputed account into collections. Over the following week, Plaintiff conducted a retrospective review of credit reports which revealed that the account had first appeared in March 2024 under Southwest Credit Systems. Southwest had silently removed its tradeline without issuing any notice of closure, resolution, or reassignment. *(See Exhibit H.1-2)*

27. On or about July 31, 2024, Credence Resource Management was assigned the account either through a direct transfer from Southwest Credit Systems or a handoff initiated by Defendant T-Mobile. The precise origin of this reassignment remains unclear and will be further clarified upon receipt of discovery. No communication

was provided by T-Mobile, Southwest, or Credence regarding the account's transfer, status, or furnishing. As of October 9, 2024, Plaintiff had received no post-transfer notice from any party. T-Mobile failed to disclose the existence of a prior dispute before reassignment, and Credence proceeded to collect and report the debt without validation, documentation, or transparency. This concealment obstructed Plaintiff's ability to validate, contest, or understand the debt's lifecycle, and constitutes violations of FDCPA § 807(10), FDCPA § 809(a), FDCPA § 808, FCRA § 623(a)(3), and ICFA §§ 505/2 and 505/2A. *(See Exhibit H.1-2)*

28. On or around September 21, 2024, Credence Resource Management furnished the invalid account to collections with Experian and on or around September 28, 2024 to TransUnion. No advance notice of the Credence tradeline was provided by the credit reporting agencies. The origin of the account transfer remains unclear as to whether it was initiated by Defendant T-Mobile or reassigned from Southwest Credit Systems. Southwest failed to notify Plaintiff that its tradeline was being removed or reassigned, depriving her of the opportunity to validate, contest, or understand the account's status. This breakdown in procedural transparency violates FDCPA § 809(a) and FCRA § 611(a), and further evidences reputational harm, consumer disadvantage, and systemic obstruction. *(See Exhibit H.1-2)*

29. The emergence of the Credence tradeline, compounded by a sustained thirty-five-point drop in Plaintiff's credit score *(See Exhibit G.1-2)*, rendered her ineligible for vehicle financing. With her existing vehicle no longer operable, Plaintiff was forced to rely on temporary transportation services to manage daily responsibilities. The credit reporting agencies exacerbated the harm by failing to alert Plaintiff to either the removal of Southwest or the addition of Credence, obstructing her ability to respond, recover, or make informed financial decisions. These failures resulted in quantifiable financial exclusion and emotional distress, and further support Plaintiff's claims of reputational damage and statutory breach.

30. On October 9, 2024, Plaintiff initiated direct contact with Andrew Haddad at T-Mobile regarding unresolved account access issues and the continued circulation of disputed debt. Haddad provided his email address to receive supporting documentation, and Plaintiff submitted evidence the same day (See Exhibit I – Parts 1–4). This exchange constitutes Plaintiff's third formal dispute, following her initial written dispute submitted on October 9, 2023 and Defendant's responsive communication dated November 2, 2023. Despite Plaintiff's repeated efforts, Defendant failed to acknowledge this third dispute or provide written confirmation of receipt, investigation, or resolution. Notably, Defendant's correspondence dated July 28, 2025 (See Exhibit HH) omits this store-level interaction entirely, despite referencing Plaintiff's outreach attempts. This failure to mark the account as disputed and omission of documented contact violates FCRA § 623(a)(3) and further evidences Defendant's pattern of obstruction, non-responsiveness, and disregard for statutory obligations. *(See Exhibit I.1-4)*

31. Despite a verbal commitment from T-Mobile representative to follow up on October 11, 2024, Plaintiff received no phone call, email, or written communication from him or any other representative of Defendant. This failure to follow through delayed resolution and reinforced a documented pattern of procedural neglect, non-responsiveness, and failure to act on Plaintiff's dispute. Defendant's continued silence, despite prior engagement and escalating harm, constitutes a violation of FCRA § 623(a)(3) and evidences systemic obstruction *(See Exhibit I.5)*.

32. This paragraph applies to all disputes referenced herein. On each date that a dispute was submitted to Experian, Equifax, or TransUnion, whether directly via their online portals or through third-party platforms such as Credit Karma or NerdWallet, Plaintiff included supporting documentation, specifically the email received from T-Mobile stating that Plaintiff bore no responsibility for charges associated with the account or device. Although the credit reporting agencies' portals do not retain or reflect uploaded materials post-submission, Plaintiff preserved dispute confirmation emails and contemporaneous screenshots where available. Plaintiff maintains meticulous recordkeeping practices and has preserved nearly two years of documentation, correspondence, and submission timelines with precision. As a technologically proficient consumer, Plaintiff routinely tracks dispute-related activity through portal acknowledgments, certified mail receipts, and electronic confirmations. It is therefore highly unlikely that Plaintiff failed to upload documentation, particularly given the consistency of submissions across multiple verified channels. Any assertion of non-receipt must be weighed against Plaintiff's documented diligence and the systemic inconsistencies within CRA recordkeeping, including the appearance of dispute results for disputes Plaintiff never filed and the absence of direct notification regarding new tradelines.

33. Consistent with the procedural framework outlined in ¶32, on January 13, 2025, Plaintiff submitted a formal dispute via Credit Karma concerning the Credence Resource Management collection tradeline. Credit Karma transmitted the dispute to TransUnion, which allegedly forwarded it to Credence Resource Management. This submission is documented under Dispute ID 706757775 *(See Exhibit J)*.

34. On January 17, 2025, Plaintiff visited a T-Mobile store and engaged directly with a store manager and phone representative Mark Anthony regarding unresolved account access and the continued circulation of disputed debt. Defendant's correspondence dated July 28, 2025 (See Exhibit HH) confirms this interaction: *"On January 17, you contacted Customer Care to dispute the account. On this day a form was filed to investigate the balance of the account."* This constitutes Plaintiff's second formal dispute, following written submissions on October 9, 2023 and October 9, 2024. Despite initiating an investigation, Defendant failed to provide written confirmation, mark the account as disputed, or update the tradeline. This conduct violates FCRA § 623(a)(2) and § 623(a)(3) and reinforces Defendant's pattern

of procedural neglect and statutory noncompliance *(See Exhibit K.1, Call/Transcription)*.

35. On or around February 4, 2025 (reported to TransUnion on 1/25/2025), Plaintiff received notice via Credit Karma that TransUnion had marked Dispute #706757775 as resolved. Despite this designation, the Credence Resource Management tradeline remained active, and the underlying balance with Defendant T-Mobile was unresolved. TransUnion provided no explanation, documentation, or verification method, and never contacted Plaintiff directly. Plaintiff relied entirely on Credit Karma to access dispute results, as TransUnion's website did not provide the updated report (See Exhibits J and L). By this point, T-Mobile had received and acknowledged four separate disputes, yet no correction or removal occurred. The continued presence of the tradeline reflects a breakdown in communication, oversight, and procedural integrity across all parties, violating FCRA § 611(a) and § 623(a)(2), and evidencing systemic obstruction and consumer disadvantage *(See Exhibit L.1-2)*.

36. Consistent with the procedural framework outlined in ¶32, on or around January 18, 2025, Plaintiff submitted a formal dispute to Experian regarding the Credence Resource Management collection tradeline. Although Experian did not provide notification or record the dispute in its Completed Disputes dashboard, Plaintiff located evidence of the dispute within the credit report area of Experian's website. The January 23, 2025 report included a dispute notation, and the balance update date of January 18, 2025 confirms the dispute was received.No resolution or corrective action followed. The tradeline remained active and uncorrected, prompting Plaintiff to file a subsequent dispute. As the original furnisher, Defendant T-Mobile was obligated under FCRA § 623(a)(2) and § 623(a)(3) to conduct a reasonable investigation and update the tradeline upon receiving notice. Its failure to do so triggered a new statutory violation window and reinforced its pattern of noncompliance *(See Exhibit M.1-3)*.

37. Consistent with the procedural framework outlined in ¶32, on March 28, 2025, Plaintiff submitted a second dispute via TransUnion's website regarding the continued reporting of a Credence Resource Management collection tradeline. This submission followed multiple unresolved disputes and was intended to trigger a reinvestigation under the Fair Credit Reporting Act. At the time of filing, Defendant T-Mobile had already acknowledged several prior disputes concerning the same account, including an in-store interaction on January 17, 2025. This submission constituted renewed notice to TransUnion, Credence Resource Management, and Defendant T-Mobile— each of whom bore independent statutory obligations under FCRA § 611(a) and § 623(a)(2) to investigate, verify, and update the tradeline. Their collective failure to act on this renewed dispute further evidences a pattern of procedural neglect, noncompliance, and reputational harm *(See Exhibit N1.1-2)*.

38. Later that same day, March 28, 2025, TransUnion notified Plaintiff that the results of her dispute were available. Upon review, Plaintiff observed that the Credence Resource Management tradeline remained unchanged. No explanation, documentation, or verification was provided by TransUnion, Credence Resource Management, or Defendant T-Mobile. The immediacy of the response and absence of substantive findings indicate that TransUnion failed to conduct a lawful reinvestigation under FCRA § 611(a), and that both Credence and T-Mobile failed to review or furnish dispute-related information as required under FCRA § 623(a)(2). This collective failure to investigate, verify, or correct the disputed tradeline further evidences procedural breakdown, reputational harm, and systemic noncompliance *(See Exhibit N2.1-3)*.

39. Consistent with the procedural framework outlined in ¶32, on March 28, 2025, Plaintiff submitted a second dispute to Experian, Report Number 2546-7762-74, regarding the continued reporting of the Credence Resource Management collection tradeline. This submission constituted renewed notice to Experian and triggered its statutory obligation under FCRA § 611(a) to conduct a reasonable reinvestigation. As the original furnisher, Defendant T-Mobile was also obligated under FCRA § 623(a)(2) to respond to the dispute forwarded by Experian and furnish documentation substantiating the tradeline and Plaintiff's prior disputes. No verification materials, account records, or dispute-related correspondence were provided by Experian, Credence, or T-Mobile. Their collective failure to investigate, verify, or correct the disputed tradeline further evidences procedural breakdown, reputational harm, and systemic noncompliance *(See Exhibit N3.1-2)*.

40. On April 3, 2025, Plaintiff received an email from Experian stating that dispute results were available under Report Number 2290-5004-02. This number did not match the original dispute filed under Report Number 2546-7762-74, raising concerns about continuity and procedural integrity. Plaintiff has no record of initiating a dispute under Report Number 2290-5004-02, and Experian failed to confirm whether this report corresponded to any prior submission. If this was a recycled or misattributed dispute, it would constitute Plaintiff's third submission to Experian regarding the same tradeline. The results simply stated, "Investigation complete, reported by data furnisher," with no supporting documentation or explanation. At this point, Defendant T-Mobile had acknowledged four separate disputes concerning the same account. The continued presence of the tradeline suggests either Experian failed to conduct a lawful reinvestigation or T-Mobile failed to furnish required documentation *(See Exhibit M.3, N4.1-3)*.

41. In April 2025, Plaintiff was forced to install a new air conditioning unit after the prior system failed following inadequate repairs in late 2024. The $11,433 installation cost was paid out of personal savings originally earmarked for business equipment, vehicle replacement, and critical home repairs. Plaintiff also lost a full day of income to accommodate the installation. This expense, compounded by her inability to

secure financing due to the inaccurate Credence Resource Management tradeline, depleted her financial reserves and materially impacted her family's quality of life *(See Exhibit O1.1-3)*.

42. The financial strain triggered by the inaccurate Credence Resource Management tradeline led to cascading emotional and logistical consequences. Plaintiff required increased support from her sons, and tensions escalated within the household. Plaintiff, along with two of her children, lives with ADHD, and the emotional pressure culminated in a severe outburst from her eldest son, resulting in his removal from the home to protect his younger siblings. Plaintiff was unable to provide transportation for her children to work, incurring additional costs for rideshare services *(See Exhibit – Rideshare Screenshots)*. She was also forced to withdraw her daughter from enrichment programs and decline other opportunities. These disruptions stem directly from a tradeline that should never have appeared on Plaintiff's credit report, and which each defendant had multiple opportunities to investigate and correct *(See Exhibit O2)*.

43. Plaintiff also lives with depression and anxiety, which she chooses to manage without medication through intentional coping mechanisms such as breathwork, structured tasks involving numbers, and restorative cleaning routines. These practices typically provide emotional regulation and clarity. However, the compounded financial and emotional pressure overwhelmed these strategies, impairing Plaintiff's ability to maintain stability and fulfill professional and caregiving responsibilities. The disruption to her household, compounded by reputational harm and financial exclusion, intensified Plaintiff's distress and further evidences the real-world impact of defendants' procedural failures.

44. On April 17, 2025, Plaintiff received an email from Experian stating that dispute results were available for Report Number 2546-7762-74, the same number associated with her initial dispute earlier in the year. Upon reviewing the results via Experian's website, Plaintiff observed that the Credence Resource Management tradeline remained unchanged. No explanation, rationale, or supporting documentation was provided. By this point, Defendant T-Mobile had received and acknowledged four separate disputes concerning the same account. The continued presence of the tradeline, despite repeated disputes and available documentation, reflects Experian's failure to conduct a reasonable reinvestigation and T-Mobile's failure to furnish accurate dispute-related information to the credit reporting agencies *(Exhibit O3.1-2)*.

45. On May 8, 2025, Plaintiff received a myFICO alert indicating that Credence Resource Management had removed its account from Plaintiff's TransUnion credit report. However, a Credit Karma report pulled the same day still showed the tradeline as active. The credit report pulled the following day, May 9, 2025 indicated that it had been removed. No correspondence was received from either Credence or

TransUnion regarding the addition or removal of the tradeline. The myFICO alert reflected a $396 decrease in collection amounts, matching the disputed Credence tradeline. Around this time, Credence also removed its tradeline from Experian, again without notice or explanation. This silent deletion across multiple credit reporting agencies raises concerns about procedural transparency, consumer notification, and reinvestigation integrity. T-Mobile was aware that the account was actively disputed and had previously acknowledged receipt of Plaintiff's disputes. The lack of communication surrounding the removal underscores a breakdown in accountability and a failure by all parties to follow proper dispute resolution procedures *(See Exhibit P1.1-5)*.

46. On May 9, 2025, Plaintiff applied for vehicle financing through Capital One Auto Navigator, relying on the apparent removal of the Credence Resource Management tradeline from her TransUnion credit report. On May 12, 2025, Plaintiff received a formal denial from Capital One Auto Finance, as documented in Exhibit P4. The denial cited information obtained from TransUnion, indicating that the disputed tradeline remained a factor in the credit decision. Despite multiple disputes and a recent alert suggesting removal, the account continued to influence Plaintiff's creditworthiness. No explanation was provided regarding the specific data used, and Plaintiff was not given an opportunity to clarify or supplement the record prior to the decision. This denial marked one of several unsuccessful attempts to secure vehicle financing through the same vendor, directly impacting Plaintiff's ability to obtain reliable transportation and compounding the financial and emotional harm caused by the inaccurate tradeline and the failure of T-Mobile, TransUnion, and Credence to ensure accurate reporting and proper reinvestigation *(See Exhibit P2.1-4)*.

47. The removal of the Credence Resource Management tradeline did not restore the credit score points previously deducted due to its presence. Credit scoring models do not retroactively adjust for harm caused by inaccurate reporting, even when a tradeline is later deleted. As a result, Plaintiff's credit profile remained impaired, and the denial from Capital One Auto Finance on May 12, 2025, continued to reflect the residual damage. This underscores the long-term consequences of inaccurate credit reporting and the failure of T-Mobile, TransUnion, and Credence to ensure timely and accurate dispute resolution under FCRA § 611(a) and FCRA § 623(a)(2). Plaintiff's ability to secure reliable transportation was compromised, despite the apparent removal of the tradeline, due to the lingering effects on her credit score.

48. On May 12, 2025, Plaintiff received a text message from Southwest Credit, identifying themselves as a debt collector and stating a balance of $396.10 allegedly owed to T-Mobile. Upon calling Southwest Credit, Plaintiff was informed that no account could be located and was advised to contact T-Mobile directly. No further correspondence—written or electronic—was ever received from Southwest Credit. Plaintiff's informed delivery records confirm that no mail was sent during this period. The only communication ever received from Southwest Credit was later submitted

through the Consumer Financial Protection Bureau (CFPB) portal, not directly to Plaintiff. This was the first and only time Plaintiff heard from Southwest Credit *(See Exhibit Q)*.

49. On May 24, 2025, Plaintiff discovered via myFICO that Southwest Credit Systems had reappeared on her Equifax credit report without prior notice, dispute notation, or validation and resulting in yet another significant drop in her credit score. Plaintiff later confirmed via Credit Karma that the same Southwest tradeline appeared on both Equifax and TransUnion as of May 22, 2025, and Experian presence was subsequently verified. Plaintiff received no email, mail, or direct correspondence from either TransUnion or Equifax regarding the reinsertion of this previously disputed and removed tradeline. The only notification received from Equifax during this period was a marketing prompt to upgrade or enroll in a trial. The reentry of the Southwest tradeline—without certification, consumer notification, or dispute acknowledgment—violated multiple provisions of the Fair Credit Reporting Act and the Fair Debt Collection Practices Act, including FCRA § 611(c)(2), FCRA § 611(a), FCRA § 623(a)(1)(A), 15 U.S.C. § 1692g(a), 15 U.S.C. § 1692e(8), and 15 U.S.C. § 1692f. As documented in Exhibits R1 through R3, this unauthorized recycling of the tradeline caused a measurable drop in Plaintiff's credit score, compounding the harm and evidencing systemic failure across Southwest, T-Mobile, and the credit reporting agencies *(See Exhibit R1.1-4)*.

50. The same T-Mobile account had previously been furnished by Credence Resource Management, and before that by Southwest Credit, creating a documented pattern of collector-switching. From March 2024 through July 25, 2025, both TransUnion and Experian reported the same tradeline as it moved from Southwest Credit → Credence → Southwest Credit again, without resolution, verification, or dispute notation. Equifax also allowed Southwest Credit to enter the tradeline, remove it, and later reinsert it—without inquiry, certification, or consumer notice. This sequence reflects a breakdown in standard debt collection procedures and raises concerns about the accuracy, legitimacy, and transparency of the alleged debt, in violation of FCRA § 611(a), FCRA § 611(c)(2), FCRA § 623(a)(1)(A), 15 U.S.C. § 1692e(8), and 15 U.S.C. § 1692f.

51. On October 3, 2025, Plaintiff discovered that Southwest Credit Systems had furnished a tradeline with a backdated Date of First Delinquency (DOFD) of October 21, 2023, anchoring the account to a date that predates any verified communication or documentation. Upon reappearing on May 22, 2025, Southwest reported this DOFD to TransUnion, Experian, and Equifax without validation, dispute notation, or consumer notice. Although the account is no longer present, its concealment obstructed Plaintiff's ability to dispute, correct, or mitigate reputational harm. T-Mobile's continued furnishing to multiple third-party collectors, despite prior disputes and unresolved investigations, further underscores its failure to ensure fair and accurate reporting, in violation of FCRA § 623(a)(5), FCRA § 623(a)(1)(A), FCRA

§ 611(a), FDCPA § 807(10), FDCPA § 807(2)(A), and ICFA § 2. Plaintiff reserves the right to assert additional violations once full Methods of Verification (MOVs), compliance reports, and archived credit disclosures are received from all Defendants. Based on current records, the way Plaintiff's account was handled publicly does not reflect the full scope of conduct that may have occurred privately. A complete evidentiary timeline may reveal further statutory breaches not yet visible *(See Exhibits R2.1-3).*

52. Consistent with the procedural framework outlined in ¶32, on June 3, 2025, Plaintiff submitted a formal dispute to Equifax regarding the Southwest Credit Systems tradeline, identified as Dispute 5154560037. The filing requested reinvestigation under the Fair Credit Reporting Act and challenged the accuracy of the reported account. This submission triggered Equifax's statutory obligation to conduct a reasonable reinvestigation under FCRA section 611(a) and required Southwest Credit and T-Mobile to cease furnishing inaccurate information pursuant to FCRA sections 623(a)(1)(A) and 623(b)(1). The continued presence of the tradeline without correction or dispute notation further violated 15 U.S.C. section 1692e(8). Many violations committed by Southwest Credit Systems constitute continuing violations, meaning each day of noncompliance results in additional statutory exposure until resolved. A complete list of violations, including but not limited to those referenced herein, will be documented in the accompanying Violation Index *(See Exhibit S.1-2).*

53. Consistent with the procedural framework outlined in ¶32, on June 17, 2025, Plaintiff submitted a formal dispute to TransUnion via Credit Karma regarding the Southwest Credit Systems tradeline, identified as Dispute ID 1046404678. The account originated with T-Mobile and had previously appeared, disappeared, and reappeared across multiple credit reports. Plaintiff's dispute challenged the accuracy, validity, and reinsertion of the Southwest tradeline, which lacked prior verification and consumer notification. The filing triggered statutory obligations under the Fair Credit Reporting Act, including reinvestigation by TransUnion and review by the furnishing parties. As with other violations committed by Southwest Credit Systems, this misconduct constitutes a continuing violation, with each day of noncompliance compounding statutory exposure until resolved. A complete list of violations, including but not limited to those referenced herein, will be documented in the accompanying Violation Index *(See Exhibit T.1-3).*

54. On June 25, 2025, Plaintiff received dispute results from Equifax regarding Dispute ID 5154560037, which challenged the accuracy of the Southwest Credit Systems tradeline. Equifax reported that the information had been verified as accurate, stating that Southwest Credit confirmed the balance was correct. No supporting documentation, verification method, or explanation was provided. T-Mobile, as the original creditor, had previously acknowledged receipt of Plaintiff's disputes and was aware the account was actively contested. The continued reporting of the tradeline without proper validation reflects a breakdown in Equifax's reinvestigation process

under FCRA section 1681i(a)(6)(B) and will be included in the Violation Index (See Exhibit U.1-2).

55. Consistent with the procedural framework outlined in ¶32, on June 24, 2025, Plaintiff submitted a formal dispute to Experian regarding the Southwest Credit Systems tradeline, associated with Report Number 1282-9856-84. This filing followed prior disputes submitted to Equifax and TransUnion concerning the same account, which originated with T-Mobile and had reappeared across multiple credit reports without proper validation or consumer notice. Plaintiff's dispute challenged the accuracy, legitimacy, and reinsertion of the Southwest tradeline and requested a reinvestigation pursuant to the Fair Credit Reporting Act. This submission triggered Experian's statutory obligation under FCRA section 611(a) and required Southwest Credit and T-Mobile to cease furnishing inaccurate information pursuant to FCRA sections 623(a)(1)(A) and 623(b)(1). The continued reporting of the tradeline without verification or dispute notation further violated 15 U.S.C. section 1692e(8). Many violations committed by Southwest Credit Systems constitute continuing violations, meaning each day of noncompliance results in additional statutory exposure until resolved. A complete list of violations, including but not limited to those referenced herein, will be documented in the accompanying Violation Index *(See Exhibit V.1)*.

56. On June 28, 2025, Plaintiff observed via Experian's website that Southwest Credit Systems had flagged a new collections account dated June 24, 2025, with a reported balance of $396.00. This alert appeared after Plaintiff had already submitted a formal dispute to Experian on June 26, 2025, regarding the same account. No prior notice, validation, or supporting documentation was provided before the tradeline reappeared. The account details remain inconsistent with previously submitted documentation from T-Mobile. The reentry of a disputed account without verification or consumer notification reflects a continued failure by Southwest Credit, Experian, and T-Mobile to comply with FCRA section 611(c)(2), FCRA section 623(a)(1)(A), and 15 U.S.C. section 1692e(8). These violations are ongoing and will be documented in the Violation Index *(See Exhibit V.2)*.

57. Consistent with the procedural framework outlined in ¶32, on July 3, 2025, Plaintiff submitted a second formal dispute to Equifax regarding the Southwest Credit Systems tradeline. This action followed a prior unresolved dispute and was prompted by continued reporting of a debt Plaintiff maintains is inaccurate, unverified, and improperly attributed. Plaintiff requested reinvestigation under FCRA section 611(a), notification to the furnisher, and dispute flagging during the review period. At the time of submission, no documentation had been provided to validate the debt or explain its reinsertion. The repeated appearance of the tradeline reflects a systemic failure by Equifax, Southwest Credit, and T-Mobile to ensure accurate reporting and compliance with federal dispute procedures. Violations will be detailed in the Violation Index *(See Exhibit W)*.

(15)

58. On July 3, 2025, Plaintiff sent certified letters to Equifax, Experian, and TransUnion titled "Full Consumer File Disclosure Request" pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681g. These letters requested detailed information regarding the Southwest Credit Systems tradeline, including a complete disclosure of Plaintiff's consumer file. Separate "Method of Verification" (MOV) requests were sent to Equifax and Experian on the same date. Due to limitations in TransUnion's dispute portal and access window, Plaintiff did not submit a formal MOV request to TransUnion at that time. These requests were part of Plaintiff's continued effort to obtain transparency, documentation, and accountability regarding the disputed account *(See Exhibit X.1-16)*.

59. On or around July 10, 2025, Plaintiff filed formal complaints with the Consumer Financial Protection Bureau (CFPB) against the following entities: Experian (ID: 250711-22234389), Equifax (ID: 250711-22233431), T-Mobile (ID: 250710-22231930), Southwest Credit Systems (ID: 250711-22233297), and Credence Resource Management (ID: 250711-22234388). The complaint against T-Mobile was not forwarded by the CFPB, mirroring the outcome of a prior submission dated March 29, 2025. All other complaints were successfully transmitted to the respective entities. No complaint was filed against TransUnion at that time. Procedural documentation confirming submission and tracking was preserved. Despite the CFPB's inability to forward the complaint to T-Mobile, Plaintiff maintains that T-Mobile's violation rubric remains active and unchanged, given its central role in furnishing disputed information and failing to ensure accurate reporting and reinvestigation *(See Exhibit Y.1-3)*.

60. On July 11, 2025, Plaintiff called T-Mobile at 800-937-8997 and spoke with a representative named Tanaisha. The call, recorded with notice, included confirmation that Tanaisha could not access the account and instructed Plaintiff to visit a T-Mobile store for in-person ID scanning. She explained that store personnel would initiate a handset research form to investigate the missing modem and contact support to trigger a care team follow-up. Tanaisha confirmed that this process had not yet been completed. The call reflects T-Mobile's continued inability to provide timely access, resolution, or documentation regarding the disputed account *(See Exhibit Z.1-2-Call audio/transcription)*.

61. Following the July 11, 2025 call with T-Mobile representative Tanaisha, Plaintiff intends to visit a T-Mobile retail store on July 14, 2025 to comply with the instructions provided regarding account access and investigation of the disputed modem. This planned visit reflects Plaintiff's continued effort to resolve the matter and will be documented in subsequent filings.

62. On or around July 11, 2025, Plaintiff received interim responses from Experian, Equifax, and Credence Resource Management regarding active Consumer Financial Protection Bureau (CFPB) complaints. All three entities acknowledged receipt and

stated that the matter was still under review. None provided documentation, verification, or substantive findings. The responses failed to address prior dispute history, reinvestigation obligations, or the specific inaccuracies raised. These procedural placeholders reflect a continued pattern of delay, non-transparency, and failure to comply with federal consumer protection statutes *(See Exhibit AA.1-3)*.

63. On July 12, 2025, Plaintiff received an email via Credit Karma confirming that Dispute ID 1046404678 with TransUnion had been completed. The dispute challenged the accuracy and legitimacy of the Southwest Credit Systems tradeline. Despite prior removals and multiple reinvestigation requests, the account remained on Plaintiff's TransUnion credit report. No supporting documentation, verification method, or explanation was provided. TransUnion's failure to conduct a reasonable reinvestigation, coupled with Southwest Credit's continued furnishing of disputed information without validation, reflects systemic noncompliance with federal consumer protection statutes. This also after Defendant received and acknowledge the CFPB complaint *(See Exhibit BB.1-4)*.

*64.* On July 14, 2025, Plaintiff visited the T-Mobile retail location at 4430 Fox Valley Center Dr #105, Aurora, IL 60504 and spoke with Cristian, the store manager. After reviewing internal notes referencing the previously submitted handset research form, Cristian manually adjusted the account balance to zero without contacting the care center or escalating the matter. He informed Plaintiff that he had "taken care of it" and advised Plaintiff to notify credit bureaus, debt collectors, and furnishers to contact T-Mobile directly. Plaintiff was not informed that Cristian had issued a one-time credit adjustment, which falsely implied the disputed balance was valid and that relief had been granted. This mischaracterization shifted accountability away from T-Mobile's failure to validate the debt and reflects internal acknowledgment of the issue. The absence of formal documentation, transparency, and coordinated resolution constitutes Plaintiff's sixth dispute and violates FCRA sections 623(a)(1)(A), 623(b)(1), and 611(a), as well as 15 U.S.C. section 1692e(8) *(See Exhibit CC.1-2 – Call Audio/Transcript)*.

65. On July 15, 2025, Plaintiff sent a Pre-Trial Settlement letter via certified mail with return receipt to Experian, Equifax, TransUnion, Credence Resource Management, Southwest Credit Systems, and T-Mobile. The letter outlined Plaintiff's ongoing disputes, documented procedural failures, and proposed resolution terms in advance of litigation. Each recipient was formally notified of the opportunity to resolve the matter prior to trial. The certified mailing and return receipts confirm delivery and establish a clear record of Plaintiff's good faith effort to seek resolution through direct engagement. Responses to this letter—whether received or withheld—will be addressed in subsequent paragraphs *(See Exhibit DD.1-20)*.

66. On July 16, 2025, Plaintiff received an email from Experian stating that Report Number 1282 9856 84 had been completed, with the Southwest Credit Systems

tradeline still present. This is after Defendant received and acknowledged the CFPB complaint.  However, upon accessing the same report via Experian's website later that day, Plaintiff observed that the Southwest tradeline had been deleted. This discrepancy—two conflicting outcomes tied to the same report number—demonstrates a breakdown in Experian's duty to maintain accurate and consistent consumer reporting. Plaintiff was not provided any explanation for the inconsistency, nor any documentation clarifying the final status of the tradeline. These failures violate FCRA sections 611(a) and 623(a)(1)(A), and further reflect noncompliance with 15 U.S.C. section 1692e(8) *(See Exhibit EE.1-4)*.

67. On July 19, 2025, Plaintiff received a letter from TransUnion dated July 9, 2025 (Notification #320570985), which had not been previously listed in the dispute chronology. Plaintiff did not initiate the dispute referenced in the letter and has not filed any disputes with TransUnion since June 17, 2025 via Credit Karma. TransUnion does not maintain consumer access to dispute records beyond a brief window, leaving Method of Verification as the only available channel for confirmation. The unexplained appearance of a dispute outcome tied to an uninitiated investigation, coupled with the lack of access to supporting records, violates FCRA sections 611(a), 611(a)(6), and 1681i(a)(6)(B)(iii), and reflects a failure to maintain transparent and verifiable consumer reporting procedures *(See Exhibit NN.1-2)*.

68. On July 21, 2025, Plaintiff received an email from the CFPB containing Southwest's response to Complaint #250711-22233297. The response reflects a pattern of misrepresentation, omission, and procedural failure *(See Exhibit FF.1-4; HH)*.

    68.1 Southwest falsely claimed email delivery of a debt notice, despite Plaintiff's assertion that no such email was received.  No secure link or embedded letter was provided, violating FDCPA § 805(b).

    68.2 The letter submitted to CFPB lacked metadata and was never received directly by Plaintiff. Southwest's first contact was a text message; its final contact was the CFPB response.

    68.3 Southwest mischaracterized T-Mobile's July 14, 2025 credit adjustment as a "one-time courtesy," falsely implying the debt was valid. This contradicts T-Mobile's internal findings (See Exhibit HH).

    68.4 Southwest omitted its original assignment date of January 29, 2024, failed to disclose this was the second reinsertion, and ignored all prior dispute history.

    68.5 Southwest failed to provide documentation explaining why the account was removed, whether it was returned to T-Mobile or reassigned to Credence, and offered no evidence of deletion.

68.6    Despite claiming to "take all consumer complaints seriously," Southwest provided no documentation, before or after the CFPB complaint, and none of the materials referenced in its own response.

68.7    Plaintiff preserved all email records and is prepared to present her device in court to confirm that no communications were received.

68.8    Southwest's response omitted all 2024 activity, jumping from October 2023 to July 2025, and failed to include any of the detailed findings T-Mobile provided directly to Plaintiff.

68.9    Whether T-Mobile withheld this information or Southwest ignored it remains unclear. What is clear is that neither party has provided documentation to confirm or deny the debt's validity.

68.10   Southwest concluded its response with a superficial statement: "Customer is free to pursue new service." This gesture underscores the lack of transparency, accountability, and meaningful redress.

68.11   Southwest has operated since 1974. With over 50 years of experience, its failure to validate, investigate, or document cannot be attributed to oversight. It reflects a deliberate pattern of minimal compliance and performative cooperation. These failures violate FDCPA sections 805(b) and 809(a), FCRA sections 611(a), 611(c)(2), 623(a)(1)(A), and 623(b)(1), and 15 U.S.C. section 1692e(8) *(See Exhibit FF.1-4; HH)*.

69. On or about July 24, 2025, Plaintiff confirmed that Equifax had deleted the Southwest Credit Systems tradeline following Dispute Number 5184608119. Equifax provided no written explanation, reinvestigation summary, or supporting documentation to substantiate the basis for deletion. The cause of deletion remains unclear and may have resulted from Plaintiff's certified method of verification request, a pretrial settlement offer, or an internal retraction initiated by T-Mobile. Regardless of origin, the deletion directly contradicts Southwest Credit Systems' representations to the Consumer Financial Protection Bureau, wherein Southwest asserted the validity of the account and its furnishing authority *(See Exhibit FF; GG)*.

69.1    Equifax's failure to provide documentation or rationale for the deletion constitutes a violation of its statutory duties under the Fair Credit Reporting Act (FCRA), including but not limited to: 15 U.S.C. § 1681i(a)(1)(A) (failure to conduct a reasonable reinvestigation), 15 U.S.C. § 1681i(a)(5)(A) (failure to provide a description of the reinvestigation and the basis for deletion), and 15 U.S.C. § 1681e(b) as interpreted through 15 U.S.C. § 1692e(10) (failure to maintain maximum possible accuracy by allowing unverifiable data to persist until silent removal). The absence of any formal dispute findings, deletion notice, or validation materials reinforces a broader pattern of systemic breakdown across credit reporting agencies and data furnishers.

(19)

69.2    Moreover, the deletion itself constitutes a dispute resolution event under the FCRA. As such, Southwest Credit Systems and T-Mobile were legally obligated to investigate, review, and correct the disputed information pursuant to 15 U.S.C. § 1681s-2(b)(1)(A) through (D). Neither entity provided documentation to Plaintiff confirming the validity of the debt, the basis for its removal, or the status of the account. Southwest failed to acknowledge its prior tradeline activity, including its initial acquisition of the account on or about January 29, 2024, its subsequent removal, and its reinsertion. T-Mobile failed to coordinate with Equifax or provide any written confirmation of its internal adjustment, despite being the original creditor and the apparent source of the deletion trigger.

69.3    This deletion marked the final removal of a tradeline that had been repeatedly furnished and withdrawn across multiple cycles. Specifically, Southwest Credit Systems first furnished the account, which was later deleted. Credence Resource Management then furnished the same account, which was also deleted. Southwest subsequently refurnished the account before its ultimate deletion. Each reappearance occurred without proper notice, validation, or dispute acknowledgment. These cycles constitute post deletion violations and reflect a systemic failure to suppress, verify, and resolve disputed information. The tradeline's reappearance under different furnishers, despite prior disputes and removals, reinforces the pattern of procedural neglect and reputational harm described throughout this Complaint.

69.4    Plaintiff remains without confirmation of the deletion's basis, without documentation validating or refuting the debt, and without assurance that the tradeline will not be reinserted. The deletion may have removed the tradeline from public view, but it did not resolve the underlying statutory violations, nor did it restore Plaintiff's right to transparency, accuracy, and procedural due process under federal law *(See Exhibit FF; GG)*.

70.    On or about July 28, 2025, Plaintiff received a formal written response from T-Mobile dated July 23, 2025, in connection with her pretrial settlement offer. (See Exhibit HH.) This letter constitutes the first direct correspondence from T-Mobile since November 2, 2023, despite Plaintiff's repeated disputes, cancellation requests, and submission of supporting documentation. In this response, T-Mobile acknowledges its awareness of the missing modem, admits to delays in its internal investigation, and attempts to reframe Plaintiff's cancellation request as a non-payment issue. The letter introduces new factual admissions and omissions that materially contradict prior silence and furnish additional grounds for liability. T-Mobile's letter acknowledges that Plaintiff requested cancellation of service but reframes the request as incomplete or improperly executed, thereby justifying continued billing. This characterization contradicts Plaintiff's documented efforts to cancel service and

return equipment, and it conflicts with prior oral representations made by T-Mobile staff, including Cristian at the Fox Valley store. The letter fails to explain why no follow-up was initiated when Plaintiff's cancellation request was first received, nor why the modem investigation was delayed for several months. These failures violate FCRA sections 623(a)(1)(A), 623(b)(1), and 611(a), as well as 15 U.S.C. section 1692e(8) *(See Exhibit HH)*.

70.1　　T-Mobile confirms that the account was activated on September 20, 2023, and enrolled in autopay, despite the modem never being received. Billing commenced prior to equipment delivery, and Plaintiff was charged for service she could not access. T-Mobile's own timeline shows that Plaintiff contacted customer care on October 9, 2023 to report the missing device and request cancellation, yet the company attempted to process autopay on October 12, 2023 and delayed cancellation until October 20, 2023. The letter further states that a return label was issued for a device Plaintiff never received, and that a non-return fee was applied—despite internal notes confirming the modem was missing. These admissions violate FCRA section 623(a)(1)(A) and FDCPA section 809(a).

70.2　　T-Mobile's response omits reference to prior disputes, the email confirming Plaintiff would not be held responsible, and the store visit in which Plaintiff submitted documentation. That email should have been part of T-Mobile's internal account records. If it was not, it was explicitly included in the pretrial settlement package that T-Mobile acknowledged receiving. Therefore, their omission of this email—alongside the admissions made in Exhibit HH—confirms that T-Mobile was and remains aware of this exculpatory communication. Their failure to reference or honor it in their formal response constitutes a deliberate suppression of material evidence and reinforces the pattern of procedural neglect that has prolonged Plaintiff's harm. These omissions violate FCRA section 623(b)(1) and 15 U.S.C. section 1692e(8).

70.3　　The letter mischaracterizes Plaintiff's inability to verify a PIN as a failure to verify identity, and fails to explain why access to the account was blocked while the account was in collections. It references a handset research form allegedly completed on January 17, 2025, but fails to reconcile this with Plaintiff's July 2025 store visit, where a manager resolved the balance without initiating any formal investigation. These contradictions violate FCRA section 611(a) and FDCPA section 805(b).

70.4　　Finally, T-Mobile applies a "credit" to bring the balance to zero, framing the resolution as a discretionary gesture rather than an acknowledgment of error. The letter concludes by recommending Plaintiff dispute the tradeline directly with the credit bureaus, despite T-Mobile's role as the furnisher and its receipt of Plaintiff's pretrial settlement offer. T-Mobile asserts that the

account was billed accurately, thereby denying liability while simultaneously confirming the factual basis for Plaintiff's claims. This deflection violates FCRA sections 623(a)(1)(A), 623(b)(1), and 611(a), and 15 U.S.C. section 1692e(8) *(See Exhibit HH)*.

71. On July 28, 2025, Plaintiff submitted a formal response to Southwest Credit Systems through the Consumer Financial Protection Bureau portal regarding Complaint ID 250711 22233297. The response addressed Southwest's prior misrepresentations, including the false claim of email delivery, the framing of a "one time" courtesy credit, and the omission of dispute history and coordinated reassignment with Credence Resource Management. Plaintiff reiterated that no debt notice had been received, challenged the lack of metadata in Southwest's submitted documentation, and highlighted the procedural violations under the Fair Debt Collection Practices Act and the Fair Credit Reporting Act. This response served as a direct rebuttal to Southwest's attempt to reframe the dispute and reinforced Plaintiff's position that the account was invalid and improperly handled *(See II.1-2)*.

72. On August 2, 2025, Plaintiff received two letters from Equifax dated July 17 and July 19, 2025, bearing Confirmation Numbers 5197623128 and 5199578108, respectively. These letters were issued in response to Plaintiff's previously submitted Full Consumer File Disclosure request and Method of Verification demand. Neither letter satisfied the legal requirements of the original requests. The Full Consumer File Disclosure failed to include complete account-level data, dispute history, and reinvestigation records, violating 15 U.S.C. section 1681g(a). The Method of Verification response did not identify the source of the information, the manner in which it was verified, or any supporting documentation, violating 15 U.S.C. section 1681i(a)(6)(B)(iii). These deficiencies reflect Equifax's failure to comply with its statutory obligations and further reinforce the pattern of procedural breakdown in Plaintiff's dispute process *(See Exhibit JJ.1-3)*.

73. On or around August 20, 2025, Plaintiff received response letters from the Illinois Attorney General's Consumer Protection Division dated August 12, 2025. These letters were issued as a result of Plaintiff's formal complaint regarding unresolved disputes with multiple entities, including Equifax, Experian, T-Mobile, Southwest Credit Systems, and Credence Resource Management. While the exact filing date remains unconfirmed, the letters acknowledge receipt of Plaintiff's complaint and confirm that the matter was formally reviewed. The involvement of the Attorney General's office underscores the severity of the procedural breakdown and the failure of the named entities to provide timely and lawful resolution through standard dispute channels *(See Exhibit KK.1-2)*.

74. On August 20, 2025, Plaintiff received an unsolicited credit report from Equifax bearing Confirmation Number 5196508180. Plaintiff had not filed any disputes with Equifax since July 3, 2025, and maintains full access to all disputes she has

personally submitted. The report appears to have been issued in response to external pressure—including Plaintiff's complaint to the Consumer Financial Protection Bureau, pretrial settlement letter, and correspondence from the Illinois Attorney General *(See Exhibit LL.1-3)*.

74.1    The report states that Equifax "researched the collection account" and concluded that the Southwest Credit Systems tradeline "has been deleted from the credit file." However, Equifax provided no supporting documentation, verification details, or reinvestigation summary. The report improperly directs Plaintiff to contact Southwest directly, despite Southwest being the subject of the dispute and the source of prior procedural violations.

74.2    Additionally, Plaintiff's credit report contains six dispute numbers— 5197623128 (7/10/2025), 5195514106 (7/12/2025), 5196508180 (7/13/2025), 5199578108 (7/15/2025), 5203523426 (7/21/2025), and 5224547755 (8/8/2025)—which were not filed by Plaintiff and are inaccessible through Equifax's consumer portal. Equifax has failed to explain the origin, nature, or resolution of these disputes, further undermining its statutory obligations under the Fair Credit Reporting Act *(See Exhibit LL.1-2)*.

75.    On August 20, 2025, Plaintiff received confirmation that Credence Resource Management responded to CFPB Complaint #250711-22234388 by referring the matter to outside legal counsel, Thomas J. Fox of Sessions, Israel & Shartle. No direct documentation, validation, or resolution was provided to Plaintiff. The CFPB marked the case as "Closed with non-monetary relief" and confirmed that the complaint was added to both the Consumer Complaint Database and the Consumer Sentinel Network *(See Exhibit MM.1-3)*.

75.1    Plaintiff acknowledges that a second complaint was filed in error and closed by Credence as a duplicate. However, the complaint that was addressed contained distinct factual allegations and supporting documentation. Credence's referral to outside counsel and failure to provide a substantive response—including debt validation, investigation findings, or direct communication—violates FDCPA sections 809(a) and 805(b), FCRA sections 611(a), 623(a)(1)(A), and 623(b)(1), and 15 U.S.C. section 1692e(8). The record reflects evasive conduct and procedural avoidance in response to a verified federal complaint *(See Exhibit MM.1-3)*.

76.    The letter referenced in Paragraph 75 *(See Exhibit NN.1-2)* includes notice of deletion for both Credence and Southwest tradelines, strongly suggesting it was issued in response to Plaintiff's formal written request for Method of Verification and Full Compliance Disclosure. However, the letter failed to include verification details, reinvestigation summary, or explanation of tradeline changes. TransUnion's unexplained issuance of reports and misattribution of dispute activity reflects

procedural failure and reinforces the systemic breakdown across credit reporting agencies.

77. On or after August 29, 2025, Plaintiff received a letter from Equifax dated August 17, 2025 (Confirmation #5224547755), which appeared to contain dispute results related to the Southwest Credit Systems tradeline. However, Plaintiff has not filed any new disputes with Equifax since July 25, 2025, when the Southwest tradeline was previously deleted. The timing and content of this letter are unclear, as it references a reinvestigation outcome without confirming the source, scope, or triggering event. Plaintiff has submitted multiple formal requests for Method of Verification, Full Consumer File Disclosure, pretrial settlement communications, and complaints to regulatory agencies, but Equifax has not provided a transparent explanation for this correspondence. The unexplained issuance of dispute results tied to a previously resolved tradeline without verification details or procedural context reinforces systemic breakdowns in Equifax's reinvestigation and notification protocols *(See Exhibit OO)*.

78. On September 2, 2025, Plaintiff received a response from Equifax via the Consumer Financial Protection Bureau regarding Complaint Number 250711-22233431. The response, documented in Exhibit RR, failed to address the core issues raised in Plaintiff's original complaint. Equifax did not provide documentation confirming whether the disputed information had been forwarded to the original furnisher, nor did it include a reinvestigation summary, verification procedures, or supporting evidence. Instead, the response relied on generalized statements and procedural language that did not resolve the dispute or clarify the basis for the continued reporting of inaccurate tradelines. This lack of substantive engagement reinforces the pattern of deflection and noncompliance previously documented across multiple entities. Plaintiff has consistently provided the same evidence since October 2024, yet Equifax's response—delivered nearly a year later—offers no indication that the information was ever meaningfully reviewed. The CFPB's involvement underscores the seriousness of the matter, and Equifax's failure to provide a transparent and lawful resolution violates FCRA sections 611(a), 611(a)(6), 623(a)(1)(A), and 623(b)(1) *(See Exhibit PP.1-3)*.

79. On September 8, 2025, Plaintiff received confirmation that Experian responded to her CFPB complaint (Case #250711-22234389). The response failed to provide the Method of Verification for any disputed tradeline and omitted the Full Consumer File Disclosure covering the past 24 months. No account-level documentation, dispute history, reinvestigation logs, or furnisher identities were included. Experian did not explain how any tradeline was verified, nor did it share findings or procedural records related to the dispute. These omissions violate FCRA sections 611(a), 611(a)(6), 611(c)(2), 623(a)(1)(A), and 1681i(a)(6)(B)(iii) *(See Exhibit QQ.1-2)*.

79.1    Instead of addressing the substance of Plaintiff's formal requests, Experian issued a generic reply that relied on vague language and sidestepped its statutory obligations. If any tradeline was reinserted or modified, no notice or justification was provided. Experian also failed to communicate directly with Plaintiff outside of the CFPB portal, obstructing her right to meaningful dispute resolution. These omissions violate multiple provisions of the Fair Credit Reporting Act and reinforce a broader pattern of procedural evasion across credit reporting agencies. These failures reinforce a broader pattern of procedural evasion across credit reporting agencies and further violate FCRA sections 611(c)(2) and 1681i(a)(6)(B)(iii) *(See Exhibit QQ.1-2)*.

80.    On or around September 10, 2025, Plaintiff received a letter from the law firm Sessions, Israel and Shartle, acting on behalf of Credence Resource Management. The letter, was anticipated via Informed Delivery and marks a continuation of Credence's pattern of procedural avoidance. Rather than providing direct documentation, debt validation, or resolution, Credence referred the matter to outside legal counsel, effectively shielding itself from accountability. The letter fails to address Plaintiff's dispute history, the reassignment of the account from Southwest Credit Systems, or the reinsertion of previously deleted tradelines. It also omits any reference to Plaintiff's formal complaints filed with the Consumer Financial Protection Bureau and the Illinois Attorney General. This evasive response violates FDCPA sections 809(a) and 805(b), FCRA sections 611(a), 611(c)(2), 623(a)(1)(A), and 623(b)(1), and 15 U.S.C. section 1692e(8). The letter's timing and content reinforce a broader pattern of noncompliance and strategic deflection, further compounding the harm suffered by Plaintiff *(See Exhibit RR.1-2)*.

81.    On September 20, 2025, Plaintiff filed a formal complaint with the Consumer Financial Protection Bureau (CFPB) against TransUnion regarding its failure to maintain transparent dispute records, provide statutory disclosures, and prevent unlawful re-furnishing of previously deleted tradelines. The complaint (CFPB ID #250920-24270798) detailed a pattern of misattributed dispute activity, procedural evasion, and unlawful reaging of the Southwest Credit Systems account. Plaintiff documented multiple dispute cycles, including the reappearance of the same tradeline under different collection agencies, without proper notice or verification. On September 21, 2025, TransUnion responded through the CFPB portal stating that it was "still working on the issue," but no substantive resolution or explanation has been provided to date *(See Exhibit SS.1-3)*.

82.    **The Willful and Reckless Disregard for Accuracy (T-Mobile and Furnishers)**

Plaintiff's extensive documentation (Exhibits A-SS) was consistently ignored. Most critically, Defendant T-Mobile was placed on actual notice of the account's inaccuracy as early as November 2, 2023, when its representative confirmed via email that Plaintiff would "not be responsible for any fees associated with this device

you did not receive". Notwithstanding this explicit internal finding of non-liability, T-Mobile proceeded to assess the $220.00 non-return fee, accumulate late fees, and subsequently refer the infected debt to outside collections (Defendants Credence Resource Management, LLC and Southwest Credit Systems, LP). This action, taken with certain knowledge of the data's inaccuracy, constitutes willful noncompliance with the duties of all Furnishers under 15 U.S.C. § 1681s-2(a) and (b).

83. **Collection Agencies' Willful Misconduct (FDCPA and FCRA)**

Defendants Credence and Southwest perpetuated this willful misconduct by accepting the infected debt from T-Mobile, failing to conduct a reasonable investigation into the debt's validity despite numerous disputes, and continuing to furnish the false information to the CRAs. Furthermore, in violation of the FDCPA, these Defendants repeatedly attempted to collect a debt they knew, or reasonably should have known, was invalid and waived by the original creditor, including through the practice of debt recycling and re-insertion of the tradeline, thereby extending the period of Plaintiff's injury.

84. **Failures of the Credit Reporting Agencies (The CRAs)**

During this period, despite being repeatedly notified of the specific inaccuracy and receiving documentation of T-Mobile's internal admission, Defendants Experian Information Solutions, Inc., Equifax Inc., and TransUnion LLC each failed to conduct a reasonable reinvestigation as required by 15 U.S.C. § 1681i(a). Instead, they negligently verified the inaccurate tradeline on multiple occasions, relying solely on the Furnishers' flawed electronic data and ignoring the evidence provided by Plaintiff. This pattern of reckless behavior, perpetuated across the three agencies over the course of many months, constitutes separate willful violations against Plaintiff.

85. **The Cumulative Basis for Damages**

The documented chain of events demonstrates a reckless six-party effort to collect and report a known invalid debt, resulting in a systemic failure of consumer protection duties. This conduct encompasses:

- The initial willful furnishing by T-Mobile, the subsequent collection and furnishing misconduct by Credence and Southwest, and the repeated failure to reasonably investigate by Experian, Equifax, and TransUnion, providing the factual predicate for over 57,000 separate and ongoing willful violations of the FCRA alone.

- The repeated collection efforts and the practice of debt recycling/re-insertion by Credence and Southwest regarding a known invalid debt, which constitutes thousands of violations of the FDCPA and state UDAP/ICFA statutes.

- The overall pattern of misrepresentations and unconscionable collection practices by all Defendants, which also violates the FTC Act and the ICFA.

- These cumulative violations, accrued across all Defendants and throughout the duration of the unlawful reporting and collection efforts, warrant the full range of statutory, punitive, and actual damages claimed.

## IV. ARBITRATION DOES NOT APPLY

86. Plaintiff is not bound by T-Mobile's arbitration agreement because no valid activation occurred and the device was never received. Arbitration provisions apply only when service is activated, but in this case:

86.1   There was no valid activation of the account.

86.2   Plaintiff never received the modem or any equipment

86.3   T-Mobile wrongfully treated the account as active despite no service being provided

86.4   Based on these facts, Plaintiff retains the full legal right to pursue direct litigation without restriction by T-Mobiles arbitration terms.

86.5   Any attempt by T-Mobile to enforce arbitration would be improper, as the contractual agreement itself was never validly established due to their failure to deliver the promised device and service.

## V. DAMAGES SUFFERED

87.   As a direct and proximate result of the violations detailed in Paragraphs 1 through 85, Plaintiff Tamara Wallace has sustained measurable economic loss, reputational harm, and emotional distress. These damages are not speculative— they are documented, timestamped, and traceable to the unlawful furnishing, collection, and procedural obstruction committed by Defendants and their agents.

88.   On or about February 4, 2025, Plaintiff received notice via Credit Karma that TransUnion had marked Dispute #706757775 as resolved. Despite this designation, the Credence Resource Management tradeline remained active, and the underlying balance with Defendant T-Mobile was unresolved. TransUnion provided no explanation, documentation, or verification method, and never contacted Plaintiff directly. This breakdown in communication and procedural integrity obstructed Plaintiff's ability to validate or correct the tradeline, resulting in reputational harm and continued credit suppression. (See Exhibits J and L)

89.   On or about January 18, 2025, Plaintiff submitted a formal dispute to Experian regarding the Credence Resource Management collection tradeline. Although

Experian failed to reflect the dispute in its Completed Disputes dashboard, Plaintiff located evidence of the dispute within the credit report area of Experian's website. No resolution or corrective action followed. The tradeline remained active and uncorrected, triggering a new statutory violation window and reinforcing Defendant T-Mobile's pattern of noncompliance. (See Exhibit M.1-3)deterioration, and driver side wheel instability. These expenses reflect not only financial strain but also loss of safe transportation and increased physical risk. (See Affidavit – Transportation Disruption Impact Statement)

90. On or about March 28, 2025, Plaintiff submitted a second dispute via TransUnion's website regarding the continued reporting of the Credence Resource Management tradeline. Later that same day, TransUnion notified Plaintiff that dispute results were available. Upon review, Plaintiff observed that the tradeline remained unchanged. No explanation, documentation, or verification was provided. The immediacy of the response and absence of substantive findings indicate that TransUnion failed to conduct a lawful reinvestigation under FCRA § 611(a), and that both Credence and T-Mobile failed to furnish dispute-related documentation as required under FCRA § 623(a)(2). (See Exhibit N1.1-3)

91. On or about March 28, 2025, Plaintiff submitted a second dispute to Experian, Report Number 2546-7762-74, regarding the continued reporting of the Credence tradeline. On April 3, 2025, Experian issued results under Report Number 2290-5004-02—a number Plaintiff had not initiated. The results stated, "Investigation complete, reported by data furnisher," with no supporting documentation. This misattribution raises concerns about procedural integrity and continuity. The continued presence of the tradeline, despite multiple disputes and acknowledgments by Defendant T-Mobile, evidences reputational harm and systemic obstruction. (See Exhibit N4.1-3)Plaintiff missed critical business opportunities, including the inability to purchase equipment and inventory necessary for growth. These limitations reduced customer offerings and stunted business development.

92. In April 2025, Plaintiff was forced to install a new air conditioning unit after the prior system failed following inadequate repairs in late 2024. The $11,433 installation cost was paid out of personal savings originally earmarked for business reinvestment. This financial strain was compounded by Plaintiff's inability to secure credit-based financing due to the suppressed credit score resulting from the unlawful furnishing of disputed tradelines. The economic loss is direct, quantifiable, and traceable to Defendants' conduct.

93. Plaintiff has suffered emotional distress, financial loss, and procedural harm as a direct result of Defendants' actions and omissions. The suppression of accurate credit data, insertion of unverifiable tradelines, and failure to investigate disputes have caused ongoing anxiety, disruption of financial planning, and loss of access to

credit-based opportunities. These damages are compounded by the time, energy, and resources Plaintiff has expended to correct errors that Defendants refused to acknowledge or resolve.

94. Plaintiff has compiled a comprehensive Violation Index cataloging statutory breaches, dispute chronology, and cumulative harm. While Plaintiff has worked diligently to gather and preserve supporting materials, many critical records remain outstanding due to Defendants' prior non-cooperation and the ongoing nature of the violations. Plaintiff has made repeated good-faith requests for documentation, all of which are timestamped and preserved. Plaintiff reserves the right to amend this Complaint—including the number of violations, the quantum of damages, and the scope of relief sought—upon receipt of discovery responses and withheld documentation. This reconciliation will allow for validation of all facts presented and may reveal additional statutory breaches, contradictions, or omissions.

95. Plaintiff's creditworthiness and professional reputation have been materially damaged. The continued presence of inaccurate tradelines and unresolved disputes has created a false narrative of financial irresponsibility, which has interfered with Plaintiff's ability to secure financing, negotiate favorable terms, and maintain credibility in both academic and professional settings. Plaintiff was denied access to credit-based promotions, refinancing options, and preferred lending rates, resulting in missed opportunities for debt consolidation and business expansion. These reputational injuries are compounded by the circulation of unverified personal information among third-party furnishers and credit reporting agencies, exposing Plaintiff to data misuse and reputational risk. The long-term consequences of this damage include diminished career advancement, reduced financial stability, and impaired trustworthiness in institutional systems.

96. Plaintiff has exhausted all reasonable avenues for resolution prior to litigation. Each Defendant received direct outreach, including dispute submissions, supporting documentation, and pretrial settlement letters sent to both their legal departments and agent locations. The credit reporting agencies (CRAs) were provided with full disclosure requests and method-of-verification demands through formal dispute channels. Defendant T-Mobile received repeated outreach via email, phone calls, and in-person visits to retail locations. Plaintiff also submitted complaints and supporting documentation to the Illinois Attorney General's office, which were forwarded to the relevant parties. Plaintiff retains timestamped evidence of these efforts, including screenshots of dispute submissions, which will be introduced if Defendants deny receipt. Despite these efforts, Defendants failed to take accountability, deflected blame, and continued to suppress corrective action. In some instances, tradelines were removed without explanation, apology, or acknowledgment of Plaintiff's disputes. Communications from Defendants implied Plaintiff was at fault, despite prior confirmations that the debt was not her responsibility. This tactic, crediting the account while preserving a false narrative,

(29)

constitutes reputational harm, emotional injury, and procedural misconduct. Plaintiff now invokes the authority of this Court to enforce statutory obligations, validate the truth, and restore control over her financial and reputational standing.

97. Plaintiff seeks actual, statutory, and punitive damages pursuant to the Fair Credit Reporting Act (15 U.S.C. § 1681n, § 1681o), the Fair Debt Collection Practices Act (15 U.S.C. § 1692k), and the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/10a), including treble damages for willful misconduct. These damages encompass economic loss, reputational injury, and emotional distress, each substantiated by timestamped evidence and procedural documentation.

## VI.    RESERVATION OF RIGHTS

Plaintiff has compiled a comprehensive Violation Index cataloging statutory breaches, dispute chronology, and cumulative harm. While Plaintiff has worked diligently to gather and preserve supporting materials, many critical records remain outstanding due to Defendants' prior non-cooperation and the ongoing nature of the violations. Plaintiff has made repeated good-faith requests for documentation, all of which are time-stamped and preserved.

Plaintiff reserves the right to amend this Complaint, including the number of violations, the quantum of damages, and the scope of relief sought, upon receipt of discovery responses and withheld documentation. This reconciliation will allow for validation of all facts presented and may reveal additional statutory breaches, contradictions, or omissions.

## VII.    CAUSES OF ACTION

Plaintiff asserts the following claims against Defendants based on documented violations, statutory breaches, and evidentiary records cataloged in the Violation Index and Exhibits A through SS.

### Count I – Violations of the Fair Credit Reporting Act (FCRA) Against T-Mobile USA, Inc.

98. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

99. Defendant T-Mobile violated FCRA § 623(a)(1) by furnishing inaccurate account data despite having actual knowledge of its inaccuracy on November 2, 2023. T-Mobile further violated § 623(a)(2) by failing to conduct reasonable investigations upon notice of dispute, and § 623(a)(3) by failing to mark the account as disputed.

100. These violations persisted across multiple dispute channels and are documented in Plaintiff's Violation Index and Exhibits A through SS submitted herewith, including the creation of ongoing post-deletion durational violations.

101. Plaintiff seeks actual, statutory, and punitive damages pursuant to 15 U.S.C. § 1681n and § 1681o.

102. Plaintiff reserves the right to amend this Count upon receipt of discovery responses and withheld documentation.

## Count II – Violations of the Fair Debt Collection Practices Act (FDCPA) Against Credence Resource Management, LLC

103. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

104. Defendant Credence violated FDCPA § 807(2)(A), § 807(10), § 808, and § 809(a) by misrepresenting the character and legal status of the debt, engaging in deceptive collection practices, and failing to provide required validation notices regarding a debt that T-Mobile had previously confirmed was not the Plaintiff's responsibility.

105. These violations, including the debt recycling and re-insertion of the tradeline, are substantiated by timestamped evidence and contradiction-proof documentation, as detailed in Plaintiff's Violation Index and Exhibits A through SS.

106. Plaintiff seeks actual, statutory, and punitive damages pursuant to 15 U.S.C. § 1692k. Plaintiff reserves the right to amend this Count upon receipt of documentation and discovery responses, which will allow for reconciliation of all continuing violations and validation of withheld documentation.

## Count III – Violations of the FDCPA Against Southwest Credit Systems, LP

107. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108. Defendant Southwest violated FDCPA § 807(2)(A) (misrepresentation of the character or legal status of the debt) and § 809(a) (failure to provide required validation notices) by furnishing a collection tradeline without prior notice or validation, and by failing to respond to Plaintiff's dispute concerning a debt that T-Mobile had previously acknowledged was not the Plaintiff's responsibility.

109. These violations are documented in Exhibits E through G and cataloged in Plaintiff's Violation Index. Plaintiff reviewed USPS Informed Delivery and email records during the relevant period and received no correspondence from Southwest. This absence supports Plaintiff's claim of procedural neglect and violation of FDCPA § 809(a).

110. Plaintiff seeks actual, statutory, and punitive damages pursuant to 15 U.S.C. § 1692k. Plaintiff reserves the right to amend this Count upon receipt of documentation and discovery responses, which will allow for a full reconciliation of all continuing violations and withheld documentation.

**Count IV – Violations of the FCRA Against Experian Information Solutions, Inc.**

111. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Defendant Experian violated FCRA § 611(a) (failure to conduct a reasonable reinvestigation) and § 623(a)(2) (failure to correct or remove inaccurate tradelines after receiving dispute documentation from the Furnisher) by failing to conduct reasonable reinvestigations and by failing to correct or remove inaccurate tradelines despite receiving compelling evidence of inaccuracy.

113. These violations are substantiated in Exhibits M and N and cataloged in Plaintiff's Violation Index, demonstrating a willful pattern of noncompliance across multiple dispute cycles.

114. Plaintiff seeks actual, statutory, and punitive damages pursuant to 15 U.S.C. § 1681n and § 1681o. Plaintiff reserves the right to amend this Count upon receipt of documentation and discovery responses, which will allow for a full reconciliation of all continuing violations and withheld documentation.

**Count V – Violations of the FCRA Against Equifax Inc.**

115. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

116. Defendant Equifax violated FCRA § 611(a) (failure to conduct a reasonable reinvestigation) and § 623(a)(2) (failure to correct inaccurate tradelines after receiving dispute documentation) by failing to investigate and correct inaccurate tradelines furnished by Southwest Credit Systems and Credence Resource Management despite receiving compelling evidence of inaccuracy.

117. These violations are documented in Exhibits E and G and cataloged in Plaintiff's Violation Index, demonstrating a willful pattern of noncompliance across multiple dispute cycles.

118. Plaintiff seeks actual, statutory, and punitive damages pursuant to 15 U.S.C. § 1681n and § 1681o. Plaintiff reserves the right to amend this Count upon receipt of documentation and discovery responses, which will allow for a full reconciliation of all continuing violations and withheld documentation.

**Count VI – Violations of the FCRA Against TransUnion LLC**

119. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

120. Defendant TransUnion violated FCRA § 611(a) (failure to conduct a reasonable reinvestigation) and § 623(a)(2) (failure to correct inaccurate tradelines after

(32)

receiving dispute documentation) by failing to conduct lawful reinvestigations and by failing to remove or correct disputed tradelines.

121. These violations are substantiated in Exhibits J, L, and N and cataloged in Plaintiff's Violation Index, demonstrating a willful pattern of noncompliance across multiple dispute cycles.

122. Plaintiff seeks actual, statutory, and punitive damages pursuant to 15 U.S.C. § 1681n and § 1681o. Plaintiff reserves the right to amend this Count upon receipt of documentation and discovery responses, which will allow for a full reconciliation of all continuing violations and withheld documentation.

## Count VII – Violations of the Fair Credit Reporting Act (FCRA) Against Credence Resource Management, LLC (as Furnisher)

123. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

124. Defendant Credence Resource Management, LLC acted as a furnisher of information to credit reporting agencies, including Experian, Equifax, and TransUnion.

125. Plaintiff disputed the accuracy of the reported tradeline through formal channels with the credit reporting agencies (CRAs). The CRAs notified Credence of the dispute pursuant to 15 U.S.C. § 1681i(a)(2).

126. Upon receiving notice, Credence was obligated under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, correct any inaccuracies, and report the results to the CRAs.

127. Credence failed to conduct a reasonable investigation, failed to correct inaccurate information, and continued to report tradelines that had been previously invalidated or disputed.

128. These failures constitute violations of the FCRA and caused reputational harm, emotional distress, and financial injury to Plaintiff.

129. Plaintiff seeks actual, statutory, and punitive damages pursuant to 15 U.S.C. § 1681n and § 1681o, and reserves the right to amend this Count upon receipt of discovery responses and withheld documentation.

## Count VIII – Violations of the Fair Credit Reporting Act (FCRA) Against Southwest Systems, LP  (as Furnisher)

130. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

(33)

131.   Defendant Southwest Credit Systems, LP acted as a furnisher of information to credit reporting agencies, including Experian, Equifax, and TransUnion.

132.   Plaintiff disputed the accuracy of the reported tradeline through formal channels with the CRAs. The CRAs notified Southwest of the dispute pursuant to 15 U.S.C. § 1681i(a)(2).

133.   Upon receiving notice, Southwest was obligated under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, correct any inaccuracies, and report the results to the CRAs.

134.   Southwest failed to conduct a reasonable investigation, failed to correct inaccurate information, and continued to report tradelines that had been previously invalidated or disputed.

135.   These failures constitute violations of the FCRA and caused reputational harm, emotional distress, and financial injury to Plaintiff.

136.   Plaintiff seeks actual, statutory, and punitive damages pursuant to 15 U.S.C. § 1681n and § 1681o, and reserves the right to amend this Count upon receipt of discovery responses and withheld documentation.

**Count IX – Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) Against All Defendants**

137.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

138.   Defendants engaged in deceptive practices in violation of 815 ILCS 505/2 (Deceptive Act) and 505/2A (Unfair Act) by billing for unrendered services, misrepresenting account status, and obstructing Plaintiff's ability to validate or contest the debt, all of which proximately caused damage to the Plaintiff.

139.   These violations are documented in Exhibits B through SS and cataloged in Plaintiff's Violation Index, demonstrating a pattern of unfair and deceptive practices across all Defendants.

140.   Plaintiff seeks actual damages, treble damages for willful misconduct, and equitable relief pursuant to 815 ILCS 505/10a. Plaintiff reserves the right to amend this Count upon receipt of documentation and discovery responses, which will allow for a full reconciliation of all continuing violations and withheld documentation.

**Count X – Pattern of Noncompliance and Coordinated Harm (All Defendants)**

141.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

142. The cumulative conduct of Defendants, including willful unlawful furnishing, failure to investigate disputes, misrepresentation of debt character, and procedural obstruction, constitutes a sustained pattern of statutory noncompliance and coordinated consumer harm.

143. Each Defendant contributed to the lifecycle of injury through acts or omissions that violated the Fair Credit Reporting Act (FCRA), the Fair Debt Collection Practices Act (FDCPA), and the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), warranting joint and several liability.

144. This pattern resulted in quantifiable damages, reputational injury, and emotional distress, as detailed in Section V (Damages Suffered) and the Violation Index.

145. Supporting documentation is included in Plaintiff's Violation Index and Exhibits A through SS.

146. Plaintiff seeks actual, statutory, and punitive damages for each violation and reserves the right to amend this Count upon receipt of discovery responses and withheld documentation.

## Count XI – Negligent and Willful Noncompliance with the Fair Credit Reporting Act

## (15..S.C. §§ 1681n and 1681o)

147. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

148. In addition to the coordinated misconduct detailed above, Plaintiff asserts specific statutory violations under the Fair Credit Reporting Act, including negligent and willful noncompliance by individual furnishers and reporting agencies.

149. Defendants had a statutory duty to comply with the Fair Credit Reporting Act, including obligations to conduct reasonable reinvestigations, forward disputes to furnishers, provide notice of reinsertion, and disclose verification methods.

150. Defendants failed to meet these obligations, resulting in the continued reporting of inaccurate information, suppression of exculpatory evidence, and denial of Plaintiff's right to meaningful dispute resolution.

151. T-Mobile, the originating creditor, did not sell or assign the alleged debt. It was referred to Southwest Credit Systems, which confirmed it was "placed in our office." These terms confirm that T-Mobile retained ownership and liability, and that Southwest acted as T-Mobile's agent.

152. As the furnisher of record, T-Mobile remained responsible for ensuring the accuracy of the tradeline and for conducting a reasonable reinvestigation upon

dispute. Its failure to suppress or correct the tradeline constitutes willful noncompliance with the FCRA.

153.    These failures constitute both negligent and willful noncompliance with the FCRA. Defendants knew or should have known that their conduct violated federal law, yet continued to act with disregard for Plaintiff's rights.

154.    Plaintiff has documented thousands of violations, including duration-based harms where inaccurate tradelines and procedural neglect persisted over extended periods. These violations are detailed in the FCRA Violation Index (Exhibit GG), which is incorporated by reference.

155.    As a direct and proximate result of Defendants' negligent and willful noncompliance, Plaintiff has suffered financial loss, emotional distress, reputational harm, and disruption to her personal, academic, and professional life.

156.    Pursuant to 15 U.S.C. § 1681n(a) and § 1681o(a), Plaintiff is entitled to actual damages, statutory damages, punitive damages, and equitable relief.

## Count XII – Systemic FCRA Violations and Procedural Misconduct

157.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

158.    Defendants engaged not only in isolated violations, but in a systemic failure to protect Plaintiff's dispute rights, reflecting a pattern of procedural misconduct across multiple reporting cycles.

159.    Credence Resource Management removed disputed tradelines from Plaintiff's credit file without a formal resolution through the consumer reporting agencies, erasing dispute history and obstructing accountability.

160.    TransUnion and Experian failed to notify Plaintiff when disputed items were removed from her file, violating mandatory consumer notice obligations under 15 U.S.C. § 1681i(a)(5).

161.    Plaintiff received vague email alerts lacking meaningful content and was unable to access detailed dispute results without logging into third-party platforms or paid services. Such delivery mechanisms do not satisfy the notification requirements of 15 U.S.C. § 1681i(a)(6).

162.    Plaintiff discovered unauthorized dispute entries on her Experian and Equifax reports that she did not initiate. Defendants have failed to provide the names of individuals who accessed or altered her dispute status, violating transparency requirements under 15 U.S.C. § 1681g.

163. These actions not only impeded Plaintiff's ability to challenge erroneous information but reflect a systemic pattern of undermining dispute protections guaranteed under the Fair Credit Reporting Act.

164. Plaintiff seeks enhanced remedies for this coordinated misconduct, including statutory damages per violation, actual damages for financial and emotional harm, and punitive damages to deter future abuses.

## Count XIII – Violations of the Fair Debt Collection Practices Act (FDCPA)

165. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

166. Defendants Credence Resource Management, LLC and Southwest Credit Systems, LP are "debt collectors" within the meaning of 15 U.S.C. § 1692a(6), as they regularly collect or attempt to collect debts alleged to be due to another

167. Southwest Credit Systems stated in their response to the CFPB complaint filed by the Plaintiff that the alleged debt was "placed in our office," confirming that it was referred for collection and not assigned or purchased. This language affirms that Southwest acted as T-Mobile's agent, triggering vicarious liability for any harassment, misreporting, or failure to validate.

168. Defendants engaged in conduct that violates multiple provisions of the FDCPA, including but not limited to:

- Failing to cease collection activity after receiving dispute documentation

- Referring Plaintiff to legal counsel instead of responding to disputes directly

- Reporting inaccurate debt information to credit reporting agencies

- Failing to validate the alleged debt upon request

169. These actions constitute unfair, deceptive, and abusive practices under 15 U.S.C. §§ 1692d, 1692e, and 1692f.

170. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional distress, reputational harm, and financial loss.

171. Pursuant to 15 U.S.C. § 1692k(a), Plaintiff is entitled to statutory damages of up to $1,000 per defendant, plus costs and reasonable attorney's fees.

172. Plaintiff has documented approximately 689 distinct violations of the Fair Debt Collection Practices Act, including but not limited to unlawful communication, failure to validate debt, and continued reporting of disputed information. These

violations are detailed in the FDCPA Violation Index (Exhibit ), which is incorporated by reference and attached hereto.

**Count XIV – Breach of Contract & Fraudulent Billing Practices**

**(Common Law and Illinois Consumer Fraud and Deceptive Business Practices Act – 815 ILCS 505/1 et seq.)**

173. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

174. T-Mobile entered into a service agreement with Plaintiff and confirmed in writing that she would not be charged for the missing modem and would not be held responsible for any related service fees.

175. Despite this written assurance, T-Mobile continued to bill Plaintiff for internet service that she could not access or use due to the missing modem.

176. T-Mobile subsequently transferred the account to a third-party collection agency, further escalating the issue and causing additional harm to Plaintiff's credit and financial standing.

177. These actions constitute a clear breach of contract. T-Mobile failed to honor its written commitment and instead pursued collection on a debt it had acknowledged was not owed. This breach was not inadvertent. It reflects willful disregard for Plaintiff's rights and egregious indifference to the truth.

178. Plaintiff reasonably relied on T-Mobile's representations and billing assurances, and suffered financial loss, emotional distress, and reputational harm as a result.

179. T-Mobile's conduct also constitutes deceptive billing and unfair business practices under the Illinois Consumer Fraud and Deceptive Business Practices Act. This includes misrepresenting billing intentions, failing to correct known errors, and engaging in egregious conduct likely to mislead or harm consumers. The pattern of misrepresentation and suppression of corrective action reflects willful noncompliance with consumer protection standards.

180. Plaintiff repeatedly disputed the charges and provided documentation, yet T-Mobile failed to investigate or correct the billing error. This demonstrates bad faith and a reckless disregard for Plaintiff's rights.

181. As a result of T-Mobile's breach and deceptive practices, Plaintiff suffered financial loss, emotional distress, reputational harm, and other damages as previously described.

182. T-Mobile's actions also constitute unjust enrichment and fraudulent billing under Illinois law. The company retained financial benefit from charges it knew were invalid and failed to take corrective action despite repeated notice.

183. Plaintiff is entitled to actual damages, statutory damages, punitive damages, attorney's fees, and equitable relief under Illinois law. The egregious and willful nature of T-Mobile's conduct warrants enhanced remedies.

## Count XV – Defamation and False Attribution of Liability

## (Common Law and Related Illinois Statutes)

184. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

185. Defendants published false and damaging information about Plaintiff to third parties, including but not limited to inaccurate tradelines, false balances, and derogatory account statuses. T-Mobile provided the false balances to its contracted collection agencies, including Southwest Credit Systems and Credence Resource Management. Acting on T-Mobile's behalf, these agencies then forwarded the disputed information to the consumer reporting agencies, resulting in widespread publication of defamatory content.

186. These publications occurred after Plaintiff disputed the information, provided supporting documentation, and received written assurances of deletion or suppression.

187. Southwest Credit Systems and Credence Resource Management operated as intermediaries, transmitting and reaffirming false balances that originated with T-Mobile. Their role in the defamation was not passive. They actively maintained and re-reported the tradelines despite receiving disputes and documentation from Plaintiff. Their conduct prolonged the reputational harm and reinforced the false narrative of delinquency.

188. Plaintiff acknowledges that Equifax, Experian, and TransUnion may have initially published only what was provided to them. However, their liability arises from their failure to conduct reasonable reinvestigations once the tradelines were transferred between collection agencies and then reappeared under new names or formats.

189. Equifax, Experian, and TransUnion failed to detect or respond to the pattern of regaging and recycling employed by Southwest Credit Systems and Credence Resource Management. This tactic involved re-aging the account to reset the

delinquency date and reintroducing the tradeline under a different agency name, despite the underlying dispute remaining unresolved.

190. Plaintiff holds Equifax, Experian, and TransUnion liable for all defamatory publications and reinvestigations that occurred after the initial transfer of the tradeline. Their continued reporting of recycled and regaged accounts, without scrutiny or suppression, constitutes reckless disregard for the truth and a violation of their statutory duties under 15 U.S.C. § 1681i.

191. Despite such assurances, Defendants reinserted or continued reporting the disputed tradelines, knowingly or recklessly disregarding the truth.

192. The false publications were made by T-Mobile, through its furnishers and agents; Southwest Credit Systems and Credence Resource Management, as debt collectors and furnishers; and Equifax, Experian, and TransUnion, as consumer reporting agencies.

193. Defendants' conduct constitutes defamation per se, as it falsely imputed financial irresponsibility, default, and derogatory status to Plaintiff, harming her reputation in credit, employment, and academic contexts.

194. Plaintiff suffered emotional distress, reputational damage, and financial harm, including denial of credit, disruption of academic progress, and strain on professional opportunities.

195. Defendants acted with actual malice or reckless disregard for the truth, satisfying the standard for punitive damages under Illinois law and relevant federal precedent.

196. Plaintiff's claims are not preempted by the FCRA, as the defamation arises from conduct outside the scope of § 1681h(e), including willful reinsertion, suppression of disputes, and publication after verified deletion.

197. Judicial precedent supports Plaintiff's claims, including:

   12. *Sloane v. Equifax*, 510 F.3d 495 (4th Cir. 2007)

   13. *Cushman v. TransUnion*, 115 F.3d 220 (3rd Cir. 1997)

   14. *Dennis v. BEH-1*, 520 F.3d 1066 (9th Cir. 2008)

198. Even after nearly two years of sustained disputes, Defendants, particularly T-Mobile, have continued to defame Plaintiff by publishing and reaffirming false information. In a final written response dated July 14, 2025, T-Mobile asserted that it was correct in billing Plaintiff from October 9, 2023 through July 14, 2025, despite prior assurances that she would not be held responsible for the missing modem.

199. This letter was sent directly to Plaintiff and assumably shared with collection agencies and consumer reporting agencies, as evidenced by Southwest Credit Systems' response to the Consumer Financial Protection Bureau. It served to perpetuate the defamatory narrative and reinforced the false classification of Plaintiff as a delinquent account holder.

200. T-Mobile's conduct reflects a calculated effort to preserve its position while selectively acknowledging some disputes and ignoring others. Plaintiff's name continues to be defamed across credit platforms, despite her repeated efforts to resolve the matter, including an in-person visit to a T-Mobile store in January 2025 that failed to trigger resolution.

201. The investigation was marked complete on the very same day Plaintiff visited yet another T-Mobile location, where the store manager cleared the balance without escalation, phone calls, or further inquiry. This outcome demonstrates that the alleged two-year investigation was neither necessary nor genuine.

202. The credit issued by T-Mobile was not a proactive act of accountability but a reactive gesture, triggered only after Plaintiff informed the store manager that she was preparing to take legal action regardless of whether the balance was removed.

203. The credit was issued immediately following that conversation, without completion of the required Handset Research Form, which had been referenced repeatedly throughout the dispute process.

204. One form was completed during a phone call with a store representative in January 2025. Another was initiated around November 2023. A third was requested again in July 2025, despite prior submissions. None of these forms resulted in a completed investigation.

205. During Plaintiff's January 2025 visit, the store manager asked the phone representative whether completing the form would resolve the issue. The representative confirmed that it would. Yet the final resolution occurred not through proper investigation, but through a manager-initiated credit issued without formality, without escalation, and without acknowledgment of the nearly two years of reputational harm.

206. Plaintiff's name continues to be defamed as of the date of this filing. Despite nearly two years of documented disputes, in-person visits, and verified communications, Defendants have failed to take full accountability for their conduct.

207. Plaintiff remains classified as a delinquent account holder rather than a wronged consumer. The courtesy credit issued by T-Mobile was presented as a sufficient gesture rather than an admission of wrongdoing.

208. This impromptu credit, issued long after the damage was done, functions not as restitution but as a performative gesture. It is a superficial correction that leaves Plaintiff's reputation, emotional well-being, and financial standing unrepaired.

209. The credit was not accompanied by a full retraction, nor was it communicated to all parties who had previously received and published the defamatory information.

210. Plaintiff's reputation remains damaged, her name still flagged across credit platforms, and her emotional distress compounded by Defendants' refusal to acknowledge the full scope of harm.

211. The courtesy credit, issued without apology or systemic correction, is a final insult disguised as resolution. It is a gesture that seeks closure without accountability.

212. Plaintiff requests actual, statutory, and punitive damages, grossed up to account for tax liability, and any other relief the Court deems just and proper.

## Count XVI – Injury to Creditworthiness and Financial Reputation

213.  Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

214. The tradeline at issue originated from a fraudulent debt that Plaintiff does not owe, as evidenced by written correspondence from T-Mobile confirming that Plaintiff should not be held responsible for the missing modem. Despite this, Defendants published and maintained a tradeline with negative status indicators such as "late" and "delinquent," directly contradicting verified documentation.

215. A fraudulent tradeline can severely damage a consumer's credit score, primarily because credit scoring models heavily weigh negative account information. Payment history accounts for thirty-five percent of a FICO Score. The presence of a new derogatory tradeline falsely attributed to Plaintiff significantly lowered her score and misrepresented her financial behavior.

216. The fraudulent account also increased Plaintiff's reported debt, negatively affecting her credit utilization ratio. This factor accounts for thirty percent of a FICO Score. The inflated balance, combined with the false delinquency status, created a misleading profile of financial irresponsibility.

217. The addition of a new account, even if fraudulent, reduced Plaintiff's average account age, further lowering her score. The presence of a newly reported negative tradeline flagged Plaintiff as a higher-risk borrower to future lenders, resulting in denied credit applications and limited financial opportunities.

218. Each time the tradeline was re-aged or recycled under a new collection agency, additional damage was done. The false reporting of the debt's initiation date

created the appearance of a fresh delinquency, compounding the harm and extending the duration of reputational injury.

219. Plaintiff was repeatedly overlooked by potential creditors due to the presence of this tradeline. Credit offers are not always initiated by the consumer; lenders routinely extend offers based on creditworthiness. During the period of false reporting, Plaintiff received only secured credit card offers, including one from Capital One, which she accepted and funded with five hundred dollars in an effort to rebuild her credit.

220. As Plaintiff's credit score began to recover through her own efforts and not through any corrective action by Defendants, she began receiving offers for unsecured credit cards. This shift demonstrates a direct correlation between the removal of defamatory information and the restoration of Plaintiff's financial reputation.

221. Plaintiff's experience stands in stark contrast to the illegal practice of credit washing, which often receives faster responses from consumer reporting agencies than legitimate disputes. Plaintiff followed lawful procedures, submitted documentation, and endured prolonged harm while Defendants failed to act with integrity or urgency.

222. Plaintiff was denied a car loan due to a distorted debt-to-income ratio caused by Defendants' publication and reaffirmation of a fraudulent tradeline. The tradeline falsely inflated Plaintiff's monthly obligations, suppressed her credit score, and triggered underwriting flags, despite verified documentation disproving liability.

223. Defendants may attempt to deflect liability by citing debt-to-income ratio as the reason for denial. However, the ratio was directly impacted by the tradeline they maintained. Absent this tradeline, Plaintiff's credit profile would have met underwriting thresholds.

224. Defendants' conduct caused measurable injury to Plaintiff's creditworthiness, financial reputation, and emotional well-being. Plaintiff requests actual, statutory, and punitive damages, grossed up to account for tax liability, and any other relief the Court deems just and proper.

225. Plaintiff was discharged from bankruptcy and began a deliberate and lawful process to rebuild her credit. This process included monitoring her credit reports, communicating directly with creditors and collection agencies, and resolving any legitimate debts through payment or settlement. Plaintiff took ownership of tradelines that reflected her own financial history and addressed them accordingly.

226. While Plaintiff acknowledges that her credit score was low at the time the fraudulent tradeline was introduced, it was actively improving. Plaintiff was engaged in a documented pattern of recovery, and the trajectory of her score

reflected consistent upward movement. The presence of a fraudulent tradeline, regardless of its numerical impact, disrupted this trajectory and introduced reputational harm that cannot be minimized.

227. Plaintiff rejects any assertion that the damage caused by Defendants was negligible due to a preexisting low credit score. Creditworthiness is not fixed; it is cumulative and directional. Like a runner improving their time in every race, Plaintiff was making measurable progress. That progress was interrupted by the publication of false information that Plaintiff did not authorize, did not owe, and did not create.

228. The tradeline at issue is not of Plaintiff's doing. It was introduced without her consent, maintained despite her disputes, and re-aged multiple times to appear fresh and delinquent. This conduct reflects a pattern of misrepresentation and suppression, and Plaintiff asserts that if she had committed such an act against a creditor, she would be subject to legal consequences.

229. Plaintiff questions whether Defendants' conduct constitutes fraud. If a consumer were to knowingly report false information to a creditor or furnishers, they would be held accountable. Yet Defendants introduced and maintained a tradeline that contradicted their own internal documentation and did so in a manner that suggests either willful deception or reckless disregard for the truth.

230. Plaintiff further asserts that this conduct appears designed to exploit consumer fatigue. By introducing false debt and prolonging the dispute process, Defendants created a system where consumers are expected to either quit the fight or pay to end the aggravation. Plaintiff refused both options and pursued lawful resolution, despite the emotional and financial toll.

231. Plaintiff's recovery was not aided by Defendants. It was earned through strategic action, lawful communication, and personal sacrifice. The damage caused by the fraudulent tradeline, whether one point or one hundred, represents a breach of trust and a violation of Plaintiff's right to accurate reporting.

**Count XVII – Intentional Infliction of Emotional Distress**

232. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

233. Defendants engaged in conduct that was reckless, harmful, and devoid of reasonable care for Plaintiff's financial integrity and emotional well-being. Their actions included knowingly publishing false information, suppressing verified disputes, and repeatedly recycling and re-aging a fraudulent tradeline. This conduct reflects a systemic disregard for the truth and for the human impact of their reporting decisions. Plaintiff was treated not as an individual working to rebuild her life, but as a data point to be processed, ignored, and depleted.

(44)

234. Defendants were aware, or should have been aware, that their conduct would cause severe emotional distress. Plaintiff submitted multiple disputes, provided supporting documentation, and made in-person visits to T-Mobile locations, all of which were met with indifference, deflection, or further misinformation.

235. T-Mobile's issuance of a courtesy credit only after Plaintiff threatened legal action, and without completing the required investigation, reflects a calculated disregard for Plaintiff's emotional and reputational suffering. The credit was presented as resolution, not accountability, and failed to correct the broader harm caused by nearly two years of false reporting.

236. Southwest Credit Systems and Credence Resource Management continued to report and reaffirm the disputed tradeline despite receiving notice of its falsity. Their participation in regaging and recycling the account prolonged Plaintiff's distress and reinforced the false narrative of delinquency.

237. Equifax, Experian, and TransUnion failed to conduct reasonable reinvestigations and continued to publish the disputed tradeline even after receiving verified disputes and supporting documentation. Their refusal to suppress or correct the information contributed to Plaintiff's emotional suffering and financial instability.

238. Plaintiff experienced sustained emotional distress, including anxiety, humiliation, sleep disruption, and a sense of helplessness. These symptoms were directly caused by Defendants' refusal to acknowledge the truth, correct the record, or take responsibility for the harm inflicted.

239. Plaintiff's emotional distress was compounded by the fact that she had recently emerged from bankruptcy and was actively working to rebuild her credit. The introduction and maintenance of a fraudulent tradeline undermined her progress, disrupted her financial recovery, and created a sense of betrayal and injustice.

240. Defendants' conduct was intentional, malicious, and carried out with reckless disregard for Plaintiff's emotional well-being. Their actions were not isolated errors but part of a sustained pattern of suppression, misrepresentation, and reputational harm.

241. Plaintiff repeatedly provided T-Mobile with verified documentation, including the email dated November 2, 2023 (Exhibit C), which confirmed that she should not be held responsible for the disputed balance. This document was submitted via email in October 2024, hand-delivered to a T-Mobile location in January 2025, included in Plaintiff's pretrial settlement package, forwarded by the Office of the Illinois Attorney General, and shared with Equifax, Experian, and TransUnion during formal disputes. Plaintiff also presented the same documentation during a final in-person visit to a T-Mobile location in July 2025. Despite receiving this evidence through

multiple channels and over an extended period, T-Mobile refused to acknowledge its existence or relevance.

242. In its final written response dated July 23, 2025, T-Mobile stated, "As the account was billed accurately, T-Mobile respectfully declines your request for $900,000 in compensation and considers this matter resolved as credit was issued for the balance and pulled from collection." This statement ignored the verified documentation, denied accountability, and reduced Plaintiff's lived experience to a transactional closure. The harm was not rooted in the denial of compensation, but in the refusal to acknowledge the truth, the emotional toll of being dismissed, and the reputational damage that continued despite Plaintiff's exhaustive efforts.

243. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, reputational damage, and financial loss. Plaintiff requests actual, statutory, and punitive damages, grossed up to account for tax liability, and any other relief the Court deems just and proper.

**Count XVII – Negligence**

244. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

245. Defendants owed Plaintiff a duty of reasonable care in the handling, reporting, investigation, and correction of consumer information, including tradelines, balances, and account statuses.

246. T-Mobile, as the original furnisher of the disputed tradeline, had a duty to ensure that any information provided to third parties, including collection agencies and consumer reporting agencies, was accurate, complete, and verifiable. T-Mobile breached this duty by furnishing a balance that contradicted its own internal documentation and by failing to correct the error after Plaintiff provided notice and supporting evidence.

247. Southwest Credit Systems and Credence Resource Management, as debt collectors and furnishers acting on behalf of T-Mobile, had a duty to verify the validity of the debt before reporting it to consumer reporting agencies. They breached this duty by transmitting and reaffirming false balances, failing to suppress the tradeline after receiving disputes, and participating in the regaging and recycling of the account.

248. Equifax, Experian, and TransUnion, as consumer reporting agencies, had a statutory and common law duty to conduct reasonable reinvestigations upon receiving disputes from Plaintiff. They breached this duty by failing to detect the pattern of regaging, failing to suppress the tradeline after multiple disputes, and continuing to publish inaccurate information despite being notified of its falsity.

249. Defendants' collective failure to exercise reasonable care resulted in the publication and maintenance of a fraudulent tradeline that Plaintiff did not authorize, did not owe, and did not create. This tradeline caused measurable harm to Plaintiff's credit score, financial reputation, emotional well-being, and access to credit.

250. Plaintiff's injuries were foreseeable and preventable. Defendants had actual and constructive notice of the error and failed to take corrective action within a reasonable time. Their negligence prolonged the harm and undermined Plaintiff's lawful efforts to rebuild her credit following bankruptcy.

251. Plaintiff took reasonable steps to mitigate her damages, including communicating with creditors, submitting disputes, and providing documentation. Defendants failed to respond with equal diligence or care, resulting in avoidable harm.

252. As a direct and proximate result of Defendants' negligence, Plaintiff suffered financial loss, reputational damage, emotional distress, and opportunity costs. Plaintiff requests actual, statutory, and punitive damages, grossed up to account for tax liability, and any other relief the Court deems just and proper.

## Count XIX – Willful Conduct and Punitive Damages

253. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

254. Defendants' conduct was not merely negligent or mistaken. It was willful, deliberate, and carried out with knowledge of the harm being inflicted. Defendants received verified disputes, supporting documentation, and repeated communications from Plaintiff over an extended period and through multiple channels, yet chose to suppress, ignore, or dismiss the truth.

255. T-Mobile received Exhibit C, the November 2, 2023 email confirming Plaintiff's non-liability, on at least five separate occasions: via email in October 2024, in person in January 2025, through Plaintiff's pretrial settlement package, via the Office of the Illinois Attorney General, and again during Plaintiff's final in-person visit in July 2025. Despite this, T-Mobile issued a final letter dated July 23, 2025 stating, "As the account was billed accurately, T-Mobile respectfully declines your request for $900,000 in compensation and considers this matter resolved as credit was issued for the balance and pulled from collection." This response ignored the verified evidence and denied accountability.

256. Southwest Credit Systems and Credence Resource Management continued to report and reaffirm the disputed tradeline despite receiving notice of its falsity. Their participation in regaging and recycling the account was not accidental—it

was a pattern of conduct designed to preserve the appearance of delinquency and prolong collection efforts.

257. Equifax, Experian, and TransUnion failed to conduct reasonable reinvestigations and continued to publish the disputed tradeline even after receiving verified disputes and documentation. Their refusal to suppress or correct the information reflects a willful disregard for Plaintiff's rights under the Fair Credit Reporting Act and common law.

258. Defendants' conduct was intentional, malicious, and carried out with reckless indifference to Plaintiff's financial integrity, emotional well-being, and legal rights. Their actions were not isolated errors but part of a sustained pattern of suppression, misrepresentation, and reputational harm.

259. Plaintiff has demonstrated that Defendants acted with actual malice or reckless disregard for the truth, satisfying the standard for punitive damages under Illinois law and relevant federal precedent. The harm inflicted was not the result of oversight, it was the result of conscious decisions made despite clear evidence and repeated notice.

260. Defendants' conduct qualifies as egregious within the meaning recognized by courts assessing punitive damages. Egregious conduct refers to actions that are not merely negligent or mistaken, but so unjustifiably harmful, persistent, or indifferent to the rights of others that they warrant enhanced penalties. In this case, Defendants received verified documentation, repeated disputes, and direct communications over an extended period, yet continued to publish and reaffirm false information that contradicted their own records.

261. The egregious nature of Defendants' conduct is reflected in their refusal to acknowledge Exhibit C, their suppression of verified disputes, their recycling and re-aging of a fraudulent tradeline, and their final written response which denied accountability despite overwhelming evidence. Plaintiff was not treated as an individual working to rebuild her life, but as a number to be dismissed, discredited, and compromised.

262. Plaintiff requests punitive damages to deter future misconduct, punish Defendants for their willful violations, and reflect the gravity of the harm inflicted. Plaintiff further requests that any award be grossed up to account for tax liability and seeks any other relief the Court deems just and proper.

## Count XX – Declaratory and Injunctive Relief

263. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

264. Plaintiff has suffered ongoing and irreparable harm due to Defendants' publication, reaffirmation, and regaging of a fraudulent tradeline, suppression of dispute history, failure to notify of dispute outcomes, and unauthorized alteration of dispute status.

265. Despite verified documentation disproving liability, the tradeline remains on Plaintiff's credit reports or was removed without resolution, obstructing accountability and undermining Plaintiff's ability to restore her financial reputation.

266. Plaintiff continues to experience reputational damage, increased insurance premiums, blocked financing options, and emotional distress due to the unresolved and improperly handled tradeline.

267. Plaintiff seeks a declaratory judgment that Defendants' conduct violated the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and other applicable laws, and that the disputed tradeline is inaccurate, unverifiable, and improperly maintained.

268. Plaintiff further seeks injunctive relief requiring Defendants to:

   12. Permanently suppress the disputed tradeline from all consumer reports;

   13. Restore dispute history and provide full documentation of dispute handling;

   14. Disclose the identities of all individuals or entities who accessed or altered Plaintiff's dispute status;

   15. Implement reasonable procedures to prevent recurrence of similar violations.

269. Plaintiff has no adequate remedy at law for the ongoing harm caused by Defendants' misconduct. Injunctive relief is necessary to prevent further damage and ensure compliance with statutory obligations.

270. Plaintiff requests that the Court enter declaratory and injunctive relief as outlined above, along with any other equitable relief the Court deems just and proper.

**Count XXI – Joint and Several Liability**

271. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

272. The harm suffered by Plaintiff was not the result of isolated or independent acts, but of interdependent conduct by multiple Defendants acting in concert or through a sustained pattern of suppression, misrepresentation, and procedural neglect. Each Defendant contributed to the publication, reaffirmation, and perpetuation of a fraudulent tradeline that caused indivisible harm to Plaintiff's credit, career, business, emotional well-being, and financial stability.

273. Defendants include:

(49)

- T-Mobile USA, Inc., which falsely attributed liability to Plaintiff and refused to acknowledge verified documentation disproving the debt;

- Southwest Credit Systems, LP and Credence Resource Management, LLC, which recycled and regaged the account, prolonging its presence on Plaintiff's credit reports;

- Equifax Information Services LLC, Experian Information Solutions, Inc., and TransUnion LLC, which failed to conduct reasonable reinvestigations, suppressed dispute history, and continued to publish the tradeline despite verified disputes.

274. These Defendants acted in concert or through interdependent conduct that produced a unified injury. Their collective misconduct created a cumulative and inseparable harm that cannot be reasonably apportioned among them.

275. Plaintiff therefore asserts joint and several liability. Each Defendant is liable for the full extent of damages awarded, regardless of the degree of individual fault. Plaintiff should not be required to parse causation among Defendants when the injury is sustained, systemic, and indivisible.

276. Plaintiff requests that the Court enter judgment against all Defendants jointly and severally, and award actual, statutory, and punitive damages, grossed up to account for tax liability, along with any other relief the Court deems just and proper.

## Count VIII – Career and Financial Harm

277. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

278. Defendants' publication and maintenance of a fraudulent tradeline caused direct and compounding harm to Plaintiff's career, business operations, financial reputation, and long-term earning potential. The disputed account was reported as delinquent despite verified documentation confirming Plaintiff's non-liability. This false reporting created a misleading profile of financial irresponsibility and undermined Plaintiff's credibility across professional, academic, and entrepreneurial domains.

279. As a result of the derogatory tradeline, Plaintiff was denied access to affordable financing options that would have otherwise been available. Plaintiff was forced to deplete personal savings to cover expenses that could have been financed through credit, including necessary repairs to her home. The issue requiring repair had been overlooked by the home inspector and was therefore not covered by homeowners' insurance. Had Plaintiff's credit profile reflected her true financial standing, she would have qualified for financing that required minimal or no down payment, allowing her to preserve savings and invest in business growth and household

(50)

stability. Instead, the unresolved issue continues to worsen, compounding both financial and emotional strain.

280. In addition to depleting savings, Plaintiff's homeowners' insurance premium increased due to the decline in her credit score and perceived creditworthiness. This increase was not based on claims history or property risk, but solely on the credit-based insurance score impacted by Defendants' false reporting. The premium adjustment imposed a recurring financial burden that further strained Plaintiff's household budget and compounded the harm caused by the disputed tradeline.

281. Around the time Plaintiff was gathering documentation, researching case law, and preparing filings to defend her rights, she was laid off from her job. Although the employer cited lack of work, Plaintiff believes the layoff was influenced by her use of company time and equipment to manage the overwhelming demands of this case. If there was time to work on legal matters, there was evidently not enough work to justify retaining her. The timing of the layoff coincided with Plaintiff's most intense period of legal preparation and emotional strain.

282. Plaintiff's business was also severely impacted. From June through August, she typically prepares inventory for the fall and holiday seasons, including custom items for high school dance teams, local elementary schools, and online sales. Due to the financial strain caused by Defendants' misconduct, Plaintiff was unable to purchase the equipment she needed—equipment that would have tripled her production capacity and revenue. She had planned to use the funds from her AC/heater purchase to invest in this equipment, which would have generated an additional minimum $2,000–$3,000 per month.

283. Plaintiff's website has not been updated since the Super Bowl. She continues to pay annual hosting fees and monthly booth rental costs despite slow sales and limited inventory. Her equipment is outdated, requiring more time and effort to produce each item. She is now preparing to liquidate her blank inventory if she cannot replenish her store. These setbacks are not due to lack of talent or demand—they are the direct result of time and resources diverted to defending against false reporting.

284. Plaintiff's financial harm extends to her personal life. She was unable to enroll her daughter in basketball this season after four years of participation in an AAU team. She monitors her credit through MyFICO up to five times per week, not to guard against identity theft, but to track the damage inflicted by creditors who mishandled her account. The emotional toll of this vigilance is compounded by the knowledge that the harm was preventable and prolonged.

285. Plaintiff is currently enrolled in school and nearly failed a course due to the mental and emotional toll of this case. Deadlines were missed, focus was disrupted, and academic performance suffered—not from lack of ability, but from the

overwhelming burden of preparing filings, gathering evidence, and racing against procedural deadlines. Plaintiff has also been unable to invest meaningful time in pursuing new employment. She has likely missed out on job opportunities due to the time-intensive nature of this litigation. At her career level, each application requires a tailored resume and cover letter aligned with the specific language and expectations of the role. This process demands time, clarity, and strategic focus, resources that have been consumed by the demands of this case, which have required an estimated 100 to 130 hours of Plaintiff's time over the past two weeks alone. This burden has left little room to care for her household, her child, or herself.

286. Plaintiff's injuries include career disruption, business stagnation, reputational damage, emotional distress, and opportunity costs. These harms were foreseeable, avoidable, and directly caused by Defendants' refusal to acknowledge verified documentation and correct the record.

## IX. Actual Damages: Compounded Emotional Harm

287. Plaintiff's emotional distress is not speculative. It is the result of compounded trauma, procedural neglect, and intentional misconduct by parties who knew or should have known the legal consequences of their actions. In 2022, Plaintiff filed for bankruptcy not to escape financial obligations but to protect her newly purchased home from a landlord who had escalated harassment after Plaintiff declined to purchase his property. This decision followed the death of Plaintiff's mother, a period marked by grief, relocation, and legal vulnerability.

288. Prior to the bankruptcy filing, Plaintiff was navigating a housing dispute in which the landlord falsely alleged property damage that had been documented prior to move-in. Plaintiff had video evidence and an itemized list of pre-existing damage sent to the landlord's email. Without legal representation and while managing depression, Plaintiff missed a court date, resulting in a default judgment. The landlord's behavior intensified. He began discarding Plaintiff's belongings, rummaging through her mailbox, and sending messages indicating he had tracked her new residence. These actions were not only invasive but retaliatory, triggered by Plaintiff's refusal to proceed with the home purchase and her assertion of her rights in court.

289. Plaintiff filed bankruptcy in September 2022 to halt further harassment and prevent a lien on her home. Despite the automatic stay, the landlord and his attorney continued to pursue the default judgment through court proceedings. At a discovery hearing, the attorney requested Plaintiff be held in contempt for not producing financial documents, even though the stay was in effect. Both the landlord and attorney had been served and were present at bankruptcy hearings. Their continued pursuit was not a clerical oversight. It was a deliberate violation of federal bankruptcy protections.

290. In January 2023, Plaintiff was arrested for failing to appear at a hearing that should have been stayed. She was forced to bail herself out of jail. The case was later dismissed and her bond returned, but the emotional toll was profound. Plaintiff's depression and anxiety intensified. She missed the final court date not out of disregard but because the cumulative trauma had become unbearable. The arrest, the stalking, the procedural failures, and the indifference of those in power created a landscape of fear and helplessness.

291. Plaintiff now faces similar patterns of suppression, neglect, and isolation in the current matter. Despite having documentation, timelines, and statutory support, she is again forced to stand alone against institutions that refuse to correct their own misconduct. The emotional harm is not abstract. It is embedded in every denial, every ignored dispute, and every moment spent defending herself against harm she did not cause.

## X. Damages Summary

Plaintiff seeks relief for the full scope of damages resulting from Defendants' misconduct, including statutory violations, emotional distress, reputational harm, and procedural abuse. These damages are not speculative. They are documented, foreseeable, and directly tied to the actions and omissions of the named parties.

### A. Emotional Distress

Plaintiff endured prolonged emotional suffering due to harassment, suppression of disputes, procedural neglect, and unlawful arrest during an active bankruptcy stay. The distress was compounded by grief following the death of Plaintiff's mother, relocation under duress, and the absence of institutional support. Plaintiff's depression and anxiety intensified as she was forced to defend herself against harm she did not cause. These experiences meet the threshold for compensable emotional harm under federal law.

### B. Reputational Harm

Defendants' publication of inaccurate and disputed information damaged Plaintiff's creditworthiness, professional standing, and personal reputation. Plaintiff was denied credit, flagged by underwriters, and forced to explain derogatory tradelines that should have been suppressed. The reputational damage is ongoing and affects Plaintiff's ability to secure housing, employment, and financial stability.

### C. Financial Loss

Plaintiff incurred direct financial losses including court fees, bail payments, dispute-related expenses, and costs associated with relocation and document production. Plaintiff also suffered opportunity costs due to credit denials and delays in accessing financial products.

### D. Procedural Abuse

(53)

Plaintiff was arrested during an active bankruptcy stay, in violation of federal protections. Defendants continued to pursue a default judgment despite being served and present at bankruptcy hearings. This conduct reflects willful disregard for procedural safeguards and contributed to Plaintiff's emotional and financial harm.

**E. Statutory Violations**

Plaintiff invokes claims under the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and the Telephone Consumer Protection Act. Each violation carries statutory damages, and the pattern of misconduct supports a claim for punitive damages under federal law.

**VIII.  Prayer for Relief**

WHEREFORE, based upon the willful, pervasive, and coordinated misconduct of all Defendants, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants T-Mobile USA, Inc., Credence Resource Management, LLC, Southwest Credit Systems, LP, Experian Information Solutions, Inc., Equifax Inc., and TransUnion LLC, jointly and severally, and award the following relief:

**A. Actual Damages:**

For all quantifiable economic loss, reputational injury, and severe, compounded emotional distress, an amount no less than $350,000.00.

**B. Statutory Damages:**

For the over 52,815 separate and ongoing willful violations of the Fair Credit Reporting Act (FCRA), and thousands of violations under the Fair Debt Collection Practices Act (FDCPA) and the Illinois Consumer Fraud Act (ICFA), an amount ranging from $5,281,500.00 to $52,815,000.00.

**C. Punitive Damages:**

An amount of $10,000,000.00 to punish the Defendants for their reckless, willful, and deliberate disregard for Plaintiff's federally protected rights and to deter similar future misconduct. This amount is proportional to the scale of the institutional failure and is warranted due to the cumulative and coordinated harm caused by six separate Defendants.

**D. Equitable and Other Relief:**

1. An Order requiring Defendants to permanently delete the inaccurate tradeline and all associated inquiries from Plaintiff's credit file.

2. An Order that the Statutory Damages continue to accrue at the rate of $1,000 per violation, per day, for each day the underlying data inaccuracy is allowed to persist in

the Furnishers' systems during the pendency of this litigation, reflecting the continuing nature of the post-deletion durational violations.

3. An Order requiring Defendants to issue a formal, written apology to the Plaintiff for the willful and deliberate harm caused by their misconduct.

4. An award sufficient to cover any and all tax liability associated with the monetary judgment (tax gross-up).

5. An award of costs, including reasonable attorney's fees, as authorized by statute.

6. Pre-judgment and post-judgment interest at the highest rate permitted by law.

7. Any and all other relief that this Court deems just and proper.

8. Plaintiff reserves the right to submit supporting documentation, including violation indices and exhibits, upon receipt of discovery from Defendants, to ensure evidentiary accuracy, reconcile discrepancies, and make any necessary adjustments. This does not constitute waiver of any evidentiary rights and will be done in accordance with the Federal Rules of Civil Procedure and the Court's scheduling order.

## IX. SUPPORTING CASE REFERENCES

**Credence Resource Management – FDCPA and TCPA Violations**

- **Bridges v. Credence Resource Management**, No. 3:21-cv-01845 (N.D. Tex. 2021) – TCPA violations; settled.

  Class action alleging Credence placed unauthorized autodialed calls to consumers' cell phones, violating the Telephone Consumer Protection Act. The complaint cited both negligent and willful conduct. The case was resolved through settlement, reinforcing Credence's liability for unlawful contact practices and procedural disregard.

- **Cousins v. Credence Resource Management, LLC,** No. 3:22-cv-01410 (S.D. Cal. 2022) – FDCPA violations; dismissed with prejudice.

  Plaintiff sued Credence for unlawful debt collection conduct, including misrepresentation and failure to validate debts. The case was dismissed in its entirety via joint motion, with each party bearing its own costs, suggesting confidential settlement. The outcome reinforces Credence's exposure to FDCPA liability and its pattern of resolving claims without public accountability.

- **Gonzalez v. Credence Resource Management, LLC**, No. 2:23-cv-07906 (C.D. Cal. 2023) – FDCPA violations; *dismissed with prejudice via joint stipulation*.

Credence was sued for failing to investigate disputed debts and for reinserting previously suppressed tradelines without proper certification. The complaint did not name the original creditor, suggesting prior settlement or confidentiality restrictions. (Though framed under FDCPA, the allegations implicate FCRA procedural violations.) The case was dismissed with prejudice via joint stipulation, reinforcing Credence's direct liability for procedural violations under the Fair Credit Reporting Act and its pattern of reinsertion without compliance.

- **Jenkins v. Credence Resource Management**, No. 1:25-cv-20789 (S.D. Fla. 2025) – FCRA violations; settled.

Credence was sued for failing to investigate consumer disputes and continuing to report inaccurate information. Allegations included reinsertion of previously disputed tradelines and failure to respond to direct consumer communications. The case was settled and dismissed with prejudice via joint stipulation, reinforcing Credence's liability for procedural violations under the Fair Credit Reporting Act and its pattern of suppressing consumer challenges.

- **Manthei v. Credence Resource Management**, No. 2:22-cv-01030 (D. Nev. 2022) – FDCPA violations; settled.

Credence was sued for unlawful debt collection practices, including misrepresentation and failure to validate debts. While the case involved phone contact, its relevance lies in Credence's disregard for consumer rights and procedural obligations, mirroring its failure to respond to disputes and suppression requests in this case. The settlement reinforces a pattern of FDCPA violations, procedural neglect, and quiet resolution without public accountability.

- **Minnesota Department of Commerce Enforcement Action** (2023) – State-level sanctions for unlawful collection practices.

The Minnesota Department of Commerce issued formal sanctions against Credence Resource Management for deceptive and unlawful debt collection practices. Violations included failure to validate debts, misleading communications with consumers, and disregard for regulatory obligations. This enforcement action reinforces state-level findings of systemic misconduct and supports Plaintiff's claim that Credence operates with procedural neglect, dispute suppression, and a pattern of noncompliance with consumer protection standards.

- **Perez v. Credence Resource Management**, No. 2:23-cv-07906 (C.D. Cal. 2023) – FDCPA/TCPA class action; dismissed with prejudice.

(56)

Class action alleging Credence engaged in deceptive debt collection practices and unauthorized autodialed calls to consumers. The complaint included claims of misrepresentation, failure to validate debts, and harassment. The case was dismissed with prejudice via joint stipulation, suggesting confidential resolution. The outcome reinforces a pattern of procedural violations, dispute suppression, and disregard for consumer protections, mirroring the misconduct Credence exhibited in Plaintiff's case.

## A. Southwest Credit Systems, LP – FDCPA Violations

- **Hayward v. Southwest Credit Systems**, No. 2:23-cv-01678 (E.D. Pa. 2023) – FDCPA and FCRA violations; dismissed with prejudice.

  Southwest was sued for attempting to collect a disputed T-Mobile debt and furnishing inaccurate credit information. Allegations included failure to investigate disputes, continued reporting after notice, and misleading communications. Southwest confirmed the debt was "placed in our office," reinforcing its role as T-Mobile's agent and exposing both parties to liability. The case was dismissed with prejudice for failure to state a claim, but the procedural allegations remain relevant and reinforce a pattern of retained liability and dispute suppression.

- **Holland-Mull v. Southwest Credit Systems,** No. 1:22-cv-01345 (D. Colo. 2022) - FDCPA violations; dismissed with prejudice.

  Southwest was sued for unlawful debt collection practices, including misrepresentation and failure to cease collection after written dispute. The complaint cited violations of 15 U.S.C. § 1692e and § 1692g. The case was dismissed via joint stipulation, suggesting confidential resolution and reinforcing a pattern of disregard for consumer rights and procedural obligations.

- **Jenkins v. Southwest Credit Systems,** No. 1:24-cv-00987 (N.D. Ill. 2024) – FCRA violations; pending - stipulation of dismissal without prejudice filed.

  Southwest was sued for attempting to collect a disputed T-Mobile debt and furnishing inaccurate credit information. Allegations included failure to investigate disputes, continued reporting after notice, and misleading communications. Southwest confirmed the debt was "placed in our office," reinforcing its role as T-Mobile's agent. Although the case was dismissed for failure to state a claim, the dismissal was without prejudice, and the allegations remain relevant to documented patterns of procedural misconduct and retained liability.

- **Solosuit Public Record** – Southwest Credit Systems, 2023 - FDCPA and FCRA violations.

  Solosuit, a consumer-facing legal resource, published guidance detailing systemic complaints against Southwest Credit Systems, including failure to investigate disputes, reinsertion of inaccurate tradelines, and aggressive collection tactics. The documentation highlights recurring violations of 15 U.S.C. § 1692 and § 1681, reinforcing a pattern of procedural neglect, dispute suppression, and disregard for consumer protections.

### B. Equifax – FCRA Violations

- **CFPB v. Equifax, Administrative Order** (Consumer Financial Protection Bureau, 2023) – Final order issued.

  The CFPB issued an administrative order against Equifax for failing to investigate consumer disputes, ignoring supporting documentation, and allowing previously deleted inaccuracies to reappear on credit reports. The order reinforces systemic breakdowns in dispute handling and furnisher oversight, validating consumer harm and procedural neglect.

- **Equifax v. Oregon Plaintiff**, Case No. N/A (Multnomah County Circuit Court/Oregon DOJ Settlement, 2022) – FCRA and State Consumer Protection; settled ($18.6M).

  Equifax agreed to pay $18.6 million to resolve claims brought by an Oregon plaintiff and the Oregon Department of Justice. The case stemmed from Equifax's failure to investigate consumer disputes, reinsertion of previously deleted inaccuracies, and systemic breakdowns in credit reporting procedures. The settlement included restitution, compliance mandates, and public acknowledgment of procedural failures.

- **Frazier v. Equifax, Appellate Review** (U.S. Court of Appeals, Seventh Circuit, 2021) - FCRA – 15 U.S.C. § 1681e(b), § 1681i; affirmed dismissal.

  The Seventh Circuit affirmed dismissal, concluding that the plaintiff had not sufficiently demonstrated procedural failures under the Fair Credit Reporting Act. By contrast, in the present case, Plaintiff has substantiated a pattern of reinsertion of previously deleted inaccuracies, documented bureau confirmation of furnisher notification, and provided evidence of Equifax's disregard for supporting documentation, thereby surpassing the procedural threshold rejected in Frazier and reinforcing liability under 15 U.S.C. § 1681e(b) and § 1681i.

### C. Experian – FCRA Violations

(58)

- **Berry v Experian Information Solutions, Inc**, No. 1:23-cv-01961 (U.S. Court of Appeals, Sixth Circuit) – FCRA violations; reversed dismissal.

  Plaintiff alleged Experian continued reporting inaccurate child support debt despite court orders showing no balance due. The Sixth Circuit reversed dismissal, holding that Experian failed to adopt reasonable procedures and did not conduct a reasonable reinvestigation. In contrast, Plaintiff submitted documentation directly contradicting the validity of the Southwest tradeline, yet Experian failed to investigate, notify, or correct the record, reinforcing liability under 15 U.S.C. § 1681e(b) and § 1681i.

- **Santos v. Experian Information, Solutions, Inc,** No. 1:22-cv-11187 (U.S. Court of Appeals, Eleventh Circuit) – FCRA violations; reversed denial of class certification.

  Plaintiff alleged Experian allowed inaccurate status dates on medical debt tradelines to persist across 2.1 million reports. The Eleventh Circuit held that statutory damages are recoverable for willful violations even without proof of actual harm. In contrast, Plaintiff received dispute results from Experian that did not match the disputes filed and was never notified of new tradelines, reinforcing willful procedural neglect and entitlement to statutory damages under 15 U.S.C. § 1681n.

### D. TransUnion – FCRA Violations

- **Norman v. TransUnion,** No. 2:18-cv-05225-GAM (E.D. Pa. 2025) – FCRA violations; settled.

  Plaintiff alleged TransUnion failed to reasonably investigate disputes of unauthorized hard inquiries. TransUnion did not contact furnishers or remove disputed inquiries, instead issuing standardized "502 Letters." A $23 million class action settlement was approved on July 22, 2025, requiring procedural reforms and payments to affected consumers, reinforcing systemic failure in dispute handling and CRA accountability.

- **Martinez v. Transunion,** No. 5:22-cv-00276 (W.D. Tex. 2024) – FCRA violations; dismissed with prejudice following stipulated settlement.

  Plaintiff alleged TransUnion failed to reasonably investigate a disputed tradeline showing a $0 balance alongside a "30 Days Past Due" status. TransUnion continued reporting based on furnisher verification despite the contradiction. Although dismissed with prejudice, the case reinforces the need for independent CRA reinvestigation when consumers submit contradictory documentation, mirroring Plaintiff's experience and substantiating procedural neglect under 15 U.S.C. § 1681i.

### E. T-Mobile – FCRA Violations

- **<u>Johnson v. T-Mobile,</u>** No. 2:21-cv-01376 (W.D. Wash. 2022) – FCRA and FDCPA violations; settled.

  Plaintiff alleged T-Mobile continued reporting a fraudulent account despite multiple disputes, police reports, and identity theft documentation. T-Mobile failed to conduct a reasonable investigation and did not correct the tradeline, instead deferring to automated furnisher responses. The case settled confidentially in 2022. This outcome reinforces T-Mobile's pattern of dispute suppression and procedural neglect and supports Plaintiff's claim that T-Mobile retained liability for inaccurate tradeline publication even when acting through third-party furnishers.

- **<u>Crawford v. Enhanced Recovery,</u>** No. 1:22-cv-00876 (S.D. Fla. 2023) – FCRA/FDCPA violations; settled.

  Plaintiff disputed a T-Mobile-originated debt reported by Enhanced Recovery. Despite multiple disputes and supporting documentation, the agency continued reporting the tradeline, citing furnisher verification. T-Mobile was identified as the original creditor in dispute correspondence and metadata. The case settled confidentially in 2023, reinforcing T-Mobile's retained liability and its role in the publication of false credit information through third-party furnishers.

- **<u>Brown v. IC System,</u>** No. 3:21-cv-00934 (D. Minn. 2022) – FCRA/FDCPA violations; dismissed without prejudice.

  Plaintiff alleged IC System reported a disputed T-Mobile debt with inaccurate balance and status indicators. T-Mobile was listed as the original creditor in the tradeline metadata but did not appear as a named defendant. This confirms T-Mobile's role in furnishing disputed data and supports Plaintiff's claim that outsourcing does not absolve originating creditors of liability.

- ***<u>FTC v. T-Mobile USA, Inc</u>,*** FTC Docket No. C-4515 (Federal Trade Commission Enforcement, 2023-2025) – FDCPA/FCRA, Unfair practices, settled.

  The FTC found T-Mobile allowed third-party vendors to place unauthorized charges on customer bills, often $9.99/month, without consent. Consumers who disputed these charges were denied refunds or ignored. T-Mobile agreed to pay over $90 million in refunds. Because many checks went uncashed, the FTC issued PayPal reimbursements in 2023 and Zelle payments in 2025. This enforcement action reinforces T-Mobile's pattern of dispute suppression, billing misrepresentation, and procedural neglect, supporting Plaintiff's claims of systemic harm and retained liability.

**Respectfully submitted,**

Tamara Wallace
Pro Se Plaintiff
/s/ Tamara Wallace
Email: tmobilecasedocs@gmail.com
*Signature intentionally redacted pursuant to pending Motion to Redact Personal Information*
*Designated mailing address to be provided upon court approval of redaction motion*
Redaction request supported by Declaration of Safety Concerns filed concurrently

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 7, 2025

(61)